**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2       NORTHERN DISTRICT OF ALABAMA
3          NORTHEASTERN DIVISION
4
5  TRINETICS INTERNATIONAL,)
6  INC.,              )
7                     )
8      Plaintiff,     )
9                     )
10 VS.                )  CASE NO:
11 URS GROUP, INC.,   )5:13-CV-00712-TMP
12                  ) DEPOSITION OF:
13     Defendant.  )  TOM HOUSER
14
15        S T I P U L A T I O N S
16
17      IT IS STIPULATED AND AGREED, by and
18 between the parties through their respective counsel,
19 that the deposition of:
20          TOM HOUSER,
21 may be taken before Merit Gilley, Commissioner and
22 Notary Public, State at Large, at the Law Offices of
23 Heard Ary, LLC, 303 Williams Avenue, Park Plaza, Suite
24 921, Huntsville, Alabama 35801, on the 17th day of
25 March, 2014, commencing at approximately 1:00 p.m.

**Page 2**

1      IT IS FURTHER STIPULATED AND AGREED that
2  the signature to and reading of the deposition by the
3  witness is not waived, the deposition to have the same
4  force and effect as if full compliance had been had
5  with all laws and rules of Court relating to the
6  taking of depositions.
7
8      IT IS FURTHER STIPULATED AND AGREED that
9  it shall not be necessary for any objections to be
10 made by counsel to any questions, except as to form or
11 leading questions, and that counsel for the parties
12 may make objections and assign grounds at the time of
13 the trial, or at the time said deposition is offered
14 in evidence, or prior thereto.
15               ***
16
17
18
19
20
21
22
23
24
25

**Page 3**

1
2            A P P E A R A N C E S
3
4  FOR THE PLAINTIFF:
5      KEVIN D. HEARD
6      Attorney at Law
7      Heard Ary, LLC
8      303 Williams Avenue
9      Park Plaza
10     Suite 921
11     Huntsville, Alabama  35801
12
13
14 FOR THE DEFENDANT:
15     JAMES K. BIDGOOD
16     Attorney at Law
17     Smith, Currie & Hancock, LLP
18     2700 Marquis One Tower
19     245 Peachtree Center Ave, N.E.
20     Atlanta, Georgia  30303-3800
21
22
23 ALSO PRESENT:
24     Chad Becker
25     John Wilhoite

**Page 4**

1            EXAMINATION INDEX
2
3  Tom Houser
4  BY MR. BIDGOOD . . . . . . . . . . . . . . 6
5
6
7           EXHIBIT INDEX
8  Exhibit                        MAR
9  1    URS Group, Inc.'s Amended Notice of      28
     Depositions
10
11 2    Proposal with Labor Pricing Tables      29
12 3    February 2014 e-mails Regarding Discovery  51
     Responses
13
14 4    Trinetics Time Sheet for Gary Davis 3/24  52
     - 4/6/12
15
16 5    February 2014 e-mails Regarding Discovery  52
     Responses Part Two
17
18 6    February 2014 e-mails Regarding Discovery  53
     Responses Part Three
19
20 7    February 2014 e-mails Regarding Discovery  53
     Responses Part Four
21
22 8    February 2014 e-mails Regarding Discovery  53
     Responses Part Five
23
24 9    8/10/12 e-mails Regarding URS Trinetics   53
     Invoices
25

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 2 of 31

Tom Houser                                          Trinetics International, Inc. vs. URS Group, Inc.

Page 5

10    Attachment 1 - URS Group Subcontract      58
11    Attachment 2 - URS Group ID/IQ            59
12    Attachment 3 - URS Group ID/IQ            59
13    Attachment 4 - Cure Notice                64
14    Attachment 5 - Trinetics' Response to     70
      Cure Notice
15    Attachment 6 - 6/13/12 e-mail Regarding   80
      Confirmation of Voluntary Termination
16    Attachment 7 - 6/13/12 Letter Acceptance  85
      of Termination for Default
17    1/22/13 Letter Request for Reimbursement  87
      for Termination
18    Attachment 10 - 3/28/13 Response to       93
      Request for Reimbursement for Termination
19    Attachment 8 - Modification of Contract   96
20    Trinetics' Response to URS Group's        100
      Interrogatories and Requests for
      Production
21    Copy of a Check in the Amount of          102
      $108,482.92
22    6/14/12 e-mails Regarding FET/CMS Payroll 104
      Invoice
23    Copy of Invoice #95016                    105
24    Copy of Check in the Amount of            106
      $120,258.14
25    Report of Deployed Task Order Personnel   107

Page 6

1        I, Merit Gilley, a Court Reporter of
2   Birmingham, Alabama, and a Notary Public for the State
3   of Alabama at Large, acting as Commissioner, certify
4   that on this date, as provided by the Federal Rules of
5   Civil Procedure and the foregoing stipulation of
6   counsel, there came before me on the 17th day of
7   March, 2014, at the law offices of Heard Ary, LLC, 303
8   Williams Avenue, Park Plaza, Suite 921, Huntsville,
9   Alabama 35801, commencing at approximately 1:00 p.m.,
10  TOM HOUSER, witness in the above cause, for oral
11  examination, whereupon the following proceedings were
12  had:
13              TOM HOUSER,
14  being first duly sworn, was examined and testified as
15  follows:
16      MR. BIDGOOD:  This will be the
17  deposition of Mr. Tom Houser and of Trinetics taken
18  pursuant to notice.  And, Kevin, and I've asked our
19  court reporter to mark that notice as Exhibit 1.
20      MR. HEARD:  That's fine.
21          EXAMINATION
22  BY MR. BIDGOOD:
23  Q       Mr. Houser, My name is Jim Bidgood.  I
24  represent URS Group in this lawsuit that Trinetics has
25  commenced against URS.  And over the course of the

Page 7

1   next day or two, ever how long the deposition takes,
2   I'll be asking you some questions.
3   A       All right.
4   Q       Sir, have you given a deposition before?
5   A       Yes, I have.
6   Q       All right.  I expect you will find this
7   to be very similar to the process that you've gone
8   through before.  I will ask a couple of things of you.
9   If you hear a question from me that's not clear,
10  please tell me that --
11  A       I will.
12  Q       -- so I can straighten it up.  I have no
13  desire to trick you or mislead you or confuse you in
14  any way.
15  A       All right.
16  Q       So let's get that straight.  If you
17  answer one of my questions, I'm going to assume that
18  you and I were communicating and you understood it.
19  But if you later decide you need to supplement or
20  change your answer, or maybe you didn't understand it;
21  you let me know that.  We'll -- we'll straighten that
22  out as well.
23  A       Okay.  I've had that happen before.
24  Q       Okay.  And I have too.  If ever I
25  interrupt you in the middle of an answer, it's

Page 8

1   unintentional.  I don't mean to cut you off.
2   A       Okay.
3   Q       So you tell me if I'm interrupting you
4   so I can let you finish.  Fair enough?
5   A       Seems fair.
6   Q       And then just from sort of practical
7   considerations:  You get to a point where you want to
8   take a break, let me know that --
9   A       Okay.
10  Q       -- and we'll take a break.  Let's go
11  ahead and get started.  Give us your full name for the
12  record, please, sir.
13  A       It's Charles Thomas Houser, H-o-u-s-e-r.
14  Q       Where do you reside, sir?
15  A       2806 Barcody, B-a-r-c-o-d-y, Circle,
16  Huntsville, Alabama 35801.
17  Q       And how long have you been at that
18  address?
19  A       Since April of this year.  Of '13.  I'm
20  sorry.
21  Q       Do you have any current plans to
22  relocate?
23  A       No.  I -- we came there from a home that
24  we lived in for 24 years.
25  Q       Okay.  All right.  What line of business

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 3 of 31

Tom Houser                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 9

1  **are you in?**
2  A        I'm the president of System Studies and
3  Simulation, generally abbreviated S Cubed here in
4  town.
5  **Q        Okay.**
6  A        And it's an aerospace and defense
7  company.
8  **Q        Tell me a little bit about S Cubed,**
9  **please.  What do you do?**
10 A        A large part of our work, approximately
11 half of it, is training Army aviators in what we call
12 the advanced platforms; the Apache gunships, the Black
13 Hawk utility helicopters, the Chinooks, the large
14 cargo helicopters; all over the United States.  And
15 then we do some training of foreign pilots as well.
16 **Q        Okay.**
17 A        That's a big part of it.  We do some
18 academic training.  Then the other side of our
19 business is what's typically referred to as SETA,
20 S-E-T-A, all caps:  Support engineering and technical
21 assistance.  And that's where we provide assistance to
22 government program offices; for example, let's say,
23 the Apache gunship program office that's acquiring
24 Apache gunships that are being deployed to U.S.
25 forces.

Page 10

1  **Q        Okay.  All right.  Are you the owner of**
2  **that company and --**
3  A        No, I'm not.  I'm the president.  I'm
4  not the owner.
5  **Q        You're just an employee --**
6  A        That's correct.
7  **Q        -- of the company?  Okay.  How long have**
8  **you been with S Cubed?**
9  A        I originally started to work there in
10 April of 2010.  And in April of 2012, I left for six
11 months until October of 2012 because of a very serious
12 illness.  My wife has lung cancer.  And so she went
13 through -- lost a lung and other treatments and so
14 forth.  So I was gone for a six-month period of time
15 in 2012.
16 **Q        Okay.  That six-month period of time**
17 **would have been, you say, roughly April to October?**
18 A        It was April of 2012 until October of
19 2012.
20 **Q        Is she doing better?**
21 A        Yes, she is.  Thank you for asking.  She
22 is doing quite well.  It was a very indolent form of
23 cancer.  But it had metastasized some; so she's under
24 very, very close watch.  We go to Houston to M.D.
25 Anderson for her treatments and scans.  We're coming

Page 11

1  up here again in a couple of three weeks.
2  **Q        Well, good luck with that.**
3  A        Every 90 days.
4  **Q        Great place.**
5  A        It's unbelievable.
6  **Q        Yeah.  Take me back, please, to your**
7  **college education; and just sort of bring me to the**
8  **current time with your work experience, education,**
9  **that kind of thing.**
10 A        Okay.  I attended a year of college in
11 California when I graduated from high school, which
12 was in 1963.  So in '63, '64 I attended college at --
13 it was LA State in those days.  It's Cal State Los
14 Angeles, I believe, or California State University Los
15 Angeles -- for one year.  And then I left college to
16 work for an indefinite period of time and continued to
17 go back to college.  In fact, I had reregistered to go
18 back to college; but in October of -- probably August
19 or so of '65, I got a draft notice.
20          And in October of '65 I was drafted into
21 the Army.  There was a war going on in Vietnam that I
22 didn't seem to know about very much until.  And to
23 make a long story short, I went to officer candidate
24 school and received a commission as a second
25 lieutenant.  And then I was an infantry second

Page 12

1  lieutenant, decided that I'd like to go to flight
2  school.  So I went to flight school and became a
3  helicopter pilot, and served two tours the Vietnam as
4  a helicopter pilot.
5          And then over time, I did a lot of the
6  education on my own.  Then the Army sent me back to
7  finish, and I finished at the University of Tampa with
8  a dual major in management and economics.  And that
9  was in 1975.  So it was 12 years after I graduated
10 from high school.
11 **Q        Uh-huh.**
12 A        And then I had a lot of flying
13 experience and all and become very interested in --
14 the Army was looking for its first astronaut.  I
15 started working towards that, but I realized my
16 education was very poor.  Make a long story short, I
17 started working my way back to try to get some type of
18 a technical master's degree.
19          And in the middle of all of that, my
20 wife passed away suddenly and -- from a brain
21 aneurism.  And I -- I had two small children, so I
22 gave that up.  But eventually I remarried and actually
23 went to graduate school.  And then I got a master of
24 science in -- when I graduated, it was called
25 electronic warfare systems technology.  They changed

Tom Houser                                    Trinetics International, Inc. vs. URS Group, Inc.

---

Page 13

1  it later to the systems engineering because there was
2  a lot of engineering courses and were some physics and
3  things like that.
4  Q       Where was that?
5  A       That was from the U.S. naval
6  post-graduate school --
7  Q       All right.
8  A       -- in Monterey, California.
9  Q       And when was it?
10  A       Graduated from there in 1983.
11  Q       Okay. How long were you in the Army?
12  A       22 years.
13  Q       So roughly '65 to '85?
14  A       '87.
15  Q       '87?
16  A       Uh-huh.
17  Q       Okay. So when you got your graduate
18  degree, you were still in the Army at that point?
19  A       I was. I actually wasn't supposed to go
20  to graduate school because they paid for -- for one
21  school. They weren't going to go pay for a graduate
22  degree.
23  Q       Right.
24  A       But because of the passing of my wife
25  and all, they said, we'll let you do anything you want

Page 14

1  anywhere in the world. You just tell us. It's pretty
2  incredible. And I told them I thought I wanted to go
3  there.
4  Q       Uh-huh.
5  A       I was at the point where I was past
6  being able to apply for the astronaut program, which I
7  got that degree. And I'd remarried at that point and
8  had four children, so I didn't do it.
9  Q       So that brings us to about '85, '87 time
10  frame?
11  A       I retired from the Army in '87. That's
12  correct.
13  Q       At what rank?
14  A       I was Lieutenant Colonel.
15  Q       Lieutenant Colonel. Okay. And then
16  what did you do upon retirement?
17  A       I was the general manager in Huntsville
18  of a -- their Huntsville operations of a firm, very
19  high tech firm in aerospace and defense called W.J.
20  Shaffer Associates. But after two years at W.J.
21  Shaffer, I was talked into joining a -- a -- I guess I
22  could call it a start-up company. It was a little
23  beyond start-up. It was in a lot of trouble. It --
24  it had 50,000 in sales the year before; and it had
25  843,000 negative shareholders equity. But I -- I

Page 15

1  decided I was going to take a lot of risk and go do
2  that, and so I did.
3          And that company was MEVATEC. It's all
4  capitals: M-E-V-A-T-E-C. And we took that company to
5  that -- and I joined them in '89. We took that
6  company to 100 and, I think it was, 21 million by
7  2003. And we sold it to BAE Systems which, of course,
8  is a large British-based international corporation.
9  Q       What were they doing? What was their
10  work?
11  A       Our work was a lot of that SETA-type
12  work --
13  Q       Okay.
14  A       -- that I mentioned to you. And then we
15  had some pretty hard core engineering things that we
16  did as well.
17  Q       Okay.
18  A       We worked in an area called lethality
19  analysis, the lethality of various weapon systems,
20  kinetic energy weapons. And that -- we did work in
21  directed energy lasers as well. And then we did some
22  programmatic support where you support the offices of
23  more on their programmatic side of things rather than
24  on the technical --
25  Q       Okay.

Page 16

1  A       -- side.
2  Q       All right. Are you a professional
3  engineer, registered engineer?
4  A       No, I am not.
5  Q       Okay.
6  A       I'm not. I don't have feel that I would
7  have the skills to pass the exam for that really.
8  Q       How long were you with the company? Did
9  you leave the company when it was sold?
10  A       No. I stayed for three years because
11  two or three of the other principals left: Our CEO,
12  and she was the principal owner. We actually had 76
13  shareholders. I believe it was around 76. She left,
14  and then my -- the next guy under me had a very --
15  pretty serious medical condition. And he came back
16  but then left too. So I stayed for three years until
17  2006. And then I left BAE.
18  Q       And then where did you go from there?
19  A       I spent about a year working as a
20  consultant, and then I worked also for ISI Partners.
21  It was an investment banking firm in Dallas. And I
22  was primarily -- well, not primarily. I was on their
23  mergers and acquisitions side of the house there,
24  primarily helping companies increase shareholder value
25  in preparation for a sale was the thing I kind of

---

Page 17

1 specialized in --
2 Q      Okay.
3 A      -- at that point in time.
4 Q      So you say you were doing that and
5 something else?  You were doing another thing?
6 A      I was actually doing some consulting too
7 work, working through them.  I did all my consulting
8 through them though.
9 Q      Okay.  And that lasted until when?
10 A      Around March of '07.
11 Q      Okay.
12 A      And then in March of '07, I was
13 approached by a gentleman who had one of my sister
14 business units at BAE Systems.  Business units,
15 typically in those days would be, oh, maybe 150
16 million.  Ours was 150, but they added 100 more
17 million into mine.  I was a chief operating officer of
18 that -- that business unit.
19      And, anyways, approached by a gentleman
20 who had been one of my BAE System -- had one of my
21 sister business units and said -- he'd moved to
22 Huntsville and said let's -- let's look at buying a
23 business and getting into logistics and sustainment
24 work.  Sustainment is sustaining forces through all
25 types of things like supply and maintenance,

Page 18

1 transportation, those kinds of things.
2 Q      Uh-huh.
3 A      And so we looked around and found a
4 company that we -- we purchased from another company
5 here in town.  It was a wholly-owned subsidiary.
6 Q      What was the name of that company?
7 A      At that time it was named the Patrick
8 Wolffe Group.  Wolffe was spelled kind of strange:
9 W-o-l-f-f-e --
10 Q      Right.
11 A      -- group.  And we brought that from
12 Anita Williams, and she was the owner of Lesco
13 Corporation, L-e-s-c-o, here in Huntsville.
14 Q      So you brought the Patrick Wolffe
15 Corporation?
16 A      That's right.  The Patrick Wolffe Group
17 and corporation.
18 Q      Okay.
19 A      It was incorporated.  Uh-huh.
20 Q      The gentleman to whom you referred a
21 moment ago, what was his name?
22 A      Andrew Kirksey, K-i-r-k-s-e-y.
23 Q      Okay.  All right.  Okay.  Please go
24 forward from there.
25 A      Okay.  So we -- we did several things.

Page 19

1 We applied for an 8A -- are you familiar with the 8A
2 program?
3 Q      Yes, sir.
4 A      Okay.  Applied for an 8A.
5 Long story:  Were eventually turned down for that, but
6 began to look at other things we could push into.  We
7 bought a hardware operation that built electronic test
8 equipment here in Huntsville at one point.  And just
9 pushed in various areas.  Hired two ladies that were
10 very good at overseas operations in terms of oper --
11 you know, mobilizing people, demobilizing them for
12 overseas type things.  And they were able to bring in
13 a contract under Fluor Corporation operating, I think,
14 in Iraq.  And I think there might have been some in
15 Afghanistan too.  I can't remember for sure.
16 Q      You said, excuse me for interrupting,
17 Fluor, F-l-u-o-r?
18 A      F-l-u-o-r.
19 Q      Okay.  All right.
20 A      And so we did that and pursued other
21 things.  Did a bid on a fairly large contract that --
22 that we -- we actually won.  Actually won two large
23 contracts; one that really not any work ever came out
24 of.  It was one of those task order type contracts.
25 We call them ID/IQ:  Indefinite deliver; indefinite

Page 20

1 quantity.
2      And then the other one was a large
3 Federal hardware contract.  It was a $125 million
4 contract that was to build this test equipment for the
5 air force.  I don't believe I was still there though
6 when that was announced.  I worked on the proposal.  I
7 left Patrick Wolffe Group, which later became
8 Trinetics and had a subsidiary -- a wholly-owned
9 subsidiary, Trinetics International.
10      I left there in, as I told you earlier,
11 April of 2010, and -- for various reasons.  Part of it
12 was just I was having to put a lot of money into the
13 company.  It wasn't making a profit.  Keep it going
14 and all.  My cash flow was terrible.  I had taken no
15 salary for years.  And then at some point I started
16 taking $10 an hour and all.  So I left there in 2010
17 to go to, as I described earlier, S Cubed.
18 Q      Hold on now.  I'm going to interrupt you
19 just for a minute so I can catch up with you.  I don't
20 want to get lost here.
21 A      Yes.  Okay.
22 Q      Trinetics was a subsidiary of the
23 Patrick Wolffe Group?
24 A      No.  Patrick Wolffe Group eventually
25 changed the name, 2111 or 2012, probably 2012, to

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 6 of 31

Tom Houser                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 21

1  Trinetics.
2  Q        Okay.  All right.
3  A        Okay.  And it had a wholly-owned
4  subsidiary.  And the wholly-owned subsidiary was
5  originally HRJ International.
6  Q        And I'm wondering what that stands for.
7  A        I believe it stood for -- the H was for
8  Hale.  Wanda Hale was one of the two ladies I
9  described to you.  And the R was Riley.  And I don't
10 know about the J.  I think it was someone else --
11 Q        Okay.
12 A        -- that they wanted to bring into the
13 business.
14 Q        H wasn't for Houser?
15 A        No, sir.  No, sir.
16 Q        Okay.  All right.  I'm with you.
17 A        So HRJ International then was a
18 wholly-owned subsidiary of Patrick Wolffe Group.
19 Eventually Patrick Wolffe Group became Trinetics, and
20 HRJ International became Trinetics International.
21 Q        Okay.  When you say "eventually," when
22 did that happen?  Do you recall?
23 A        I don't recall exactly.  But I think
24 that those name changes took place in 2011 and 2012.
25 Q        Now, you left Patrick Wolffe in 2010?

Page 22

1  A        That's correct.  April of 2010.
2  Q        And went to S Cubed at that point?
3  A        That's correct.
4  Q        Did you continue to have involvement
5  with Patrick Wolffe or Trinetics on a professional
6  basis after 2010?
7  A        Some, but it was pretty peripheral.  S
8  Cubed is a place we worked very, very long hours.  A
9  typical day is 11-hour days.  You know, that -- that
10 would probably be an average day would be 11 hours
11 there.  And a lot of weekends on proposals and things.
12 And so I really didn't have the time.
13         So I turned it over to Mr. Kirksey to
14 run the business; thinking that, you know, he would
15 qualify to do that since he's -- his business unit at
16 BAE had been very successful.  As I said, I think it
17 was about 150 million in annual sales.  And I can
18 remember that, I don't know, I think two different
19 years he achieved this certain level in the company of
20 bonus that I don't know of anyone else that did.
21 Q        Uh-huh.
22 A        I'm sure there were others, but I wasn't
23 personally aware of it.
24 Q        Even though you were not at Patrick
25 Wolffe or Trinetics, were you a part owner or whole

Page 23

1  owner of that company?
2  A        Originally, I was a 40 percent owner;
3  and Mr. Kirksey was 60 percent.  There -- there came a
4  time, and I don't know of the exact timing of it, it
5  -- it might have been 2009.  I certainly could find
6  out -- when it became apparent to us that the defense
7  security service was going to require us to have one
8  person that had 51 percent.
9         In other words, we could -- we could
10 have a majority between myself and some outside
11 shareholders that we brought in.  But they did not --
12 they didn't want that.  They wouldn't tell us that.
13 But we finally -- our attorney actually -- outside
14 attorney figured it out.  What they were really
15 looking for was that person would have 51 percent; and
16 then you could have Mr. Kirksey, who did not have a
17 clearance.  And that was the reason for their, I
18 think, being a little reticent about doing that.  So
19 Mr. Kirksey and the other ones had less -- well, they
20 had 49 percent, I believe it was, at that point.
21 Yeah, they did.  And I had 51 percent.
22 Q        Okay.
23 A        So we made that change at some point.
24 Q        Okay.  The -- the contracts that are at
25 issue in this litigation, you're familiar with those?

Page 24

1  A        I -- I am.  I didn't -- I didn't have a
2  lot of familiarity with them because -- probably, you
3  know, not nearly the familiarity that others do.  Like
4  Mr. Ori would have a lot more than I would.  Mr. Jones
5  would.  Probably even John Wilhoite would.  Because I
6  came back in, as I said, in October of 2012.  And, of
7  course, that -- it was ongoing at that point in time.
8  Q        When you say you "came back," what
9  capacity did you come back in?
10 A        You know, I -- it was just sort of --
11 things were in such chaos.  I'm sorry.  I came back --
12 I'm sorry.  Let me back up.  I got that completely
13 wrong.  I came back to S Cubed in 2012.  Again, we
14 need to get this really straight.  I came back to S
15 Cubed in 2012.  I did not work -- I was gone from --
16 because of my wife's illness, from April of 2012 until
17 October of 2012.  She had her surgery in May.  But
18 during that period of time, most of what I was doing
19 was taking care of her and all that and didn't have a
20 lot of involvement --
21 Q        Uh-huh.
22 A        -- with them.  And then I left S Cubed
23 in -- let me make sure I get all my dates right here.
24 I'm trying to think.  It was fairly straight.  I know
25 I left S Cubed in 2012 because she had her surgery

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 7 of 31

Tom Houser                                                 Trinetics International, Inc. vs. URS Group, Inc.

Page 25

1  then.  Came back to S Cubed in October of 2012.  So I
2  was associated with the company off and on, but not as
3  much as I would have been because of her illness
4  starting in April of 2012.
5  Q      And when you are referring to the
6  company, you're talking about Trinetics?
7  A      Right.
8  Q      Okay.
9  A      So starting in April of 2012, I did have
10 more involvement in Trinetics.  That is correct.  In
11 fact, you know, in April maybe, or certainly in
12 May, I had some conversations on the phone with Chad.
13 And that would have been in May of 2012.
14 Q      In 2012 were you a 51 percent owner of
15 Trinetics?
16 A      I'm fairly certain that I was at that
17 point.  I would have had to be because -- in order for
18 it to have a clearance --
19 Q      Okay.
20 A      -- I would have needed to be a 51
21 percent owner.
22 Q      In looking at your career, and you've
23 given me a good summary of it --
24 A      Uh-huh.
25 Q      -- how much of your career after you

Page 26

1  retired from the Army has been involved in what might
2  be called as government contracting, either
3  contracting directly with the government or as a
4  subcontractor?
5  A      Probably 95 percent.  I -- we had a
6  commercial subsidiary at MEVATEC.  It actually did
7  some government work, but it did quite a bit of
8  commercial work.  Currently, we have a commercial --
9  do you know what a part 135 and 145 operation is?
10 Q      No.
11 A      It deals with FAA certificates.
12 Q      Okay.
13 A      And so we have a commercial flying
14 operation that does maintenance and charters and
15 things like that.
16 Q      Uh-huh.
17 A      But I say -- I would say if you put that
18 all together in the revenue side, it's probably 95
19 percent.
20 Q      Do you have any formal training,
21 education, certificates, anything like that, in
22 Federal government contracting?
23 A      Not really.  Just a lot of experience
24 because at -- and I always tell people that contracts
25 are probably my weakest part.  I know HR and finance,

Page 27

1  especially finance side, pretty well.  But I did -- I
2  was exposed to a lot of that in the government, doing
3  some program management in the government at one point
4  and then at MEVATEC when we were a start-up.  And, you
5  know, everybody kind of has to pitch in and do things
6  until you get a real contract structure.
7  Q      Uh-huh.  Did you -- were you a
8  helicopter pilot right up until the time you retired?
9  A      No.  In those days, they wouldn't allow
10 you to stay in aviation because it would kill your
11 career off.  So I had two tours in Vietnam as a
12 helicopter pilot and some fixed wing because I was
13 dual rated.  And I was an instructor pilot, and then I
14 was a production test pilot.  And that span of that
15 was about ten years.
16 Q      Uh-huh.  Okay.  All right.  And then I
17 think you said you rejoined S Cubed in October of '12
18 give or take?
19 A      That's correct.
20 Q      All right.  And are you still 51 percent
21 owner of Trinetics?
22 A      I would, suppose in a legal sense, I am;
23 though the company really doesn't exist at this point
24 in time.
25 Q      Has -- to your knowledge, has the

Page 28

1  company gone through a formal dissolution process?
2  A      We've not done a formal dissolution.
3  Q      Has there been any filing in bankruptcy
4  court regarding Trinetics to your knowledge?
5  A      No.
6  Q      It's just a company that's not doing
7  anything at this point?
8  A      That's correct.
9  Q      Okay.  I'm going to ask you to look at
10 what has been marked as Exhibit 1.
11        (Exhibit Number 1 was
12        marked for identification.)
13 A      Certainly.
14 Q      And just ask you if you have seen that
15 before today.
16 A      I have.
17 Q      Okay.  And when you saw it; did it have
18 the list of topics that are attached as Exhibit A, I
19 think, or Exhibit 1?
20 A      Yes.
21 Q      Okay.  Thank you.
22 A      Do you want me to hold those exhibits so
23 that you can refer back to them at some point, or do
24 you want me to hand those back to you?
25 Q      We'll just keep them in a stack so --

Case 5:13-cv-00712-TMP Document 23-12 Filed 05/06/14 Page 8 of 31

Tom Houser                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 29

1  A      Okay.

2  Q      I've been known to walk out with
3  exhibits, and our court reporter gets mad at me if I
4  do that.

5  A      Going back just for a moment to clarify
6  on the contracts training, I haven't been through any
7  formal contracts training. But I do deal, as a chief
8  operating officer, with all business operations under
9  the MEVATEC and then deal with it a lot now because I
10 have all the technical operations of the company. I
11 don't have the business operations. But every day
12 there's some kind of a contracts issue that will come
13 up in one of our business units or subsidiaries.

14 Q      Yeah. Well, it's obvious you have a lot
15 of experience. I didn't know if you'd been to a
16 contracting officer school or anything like that?

17 A      No. I know enough to be dangerous.

18 Q      Okay.

19         MR. BIDGOOD: Let's mark this as Exhibit
20 2.

21         (Exhibit Number 2 was
22          marked for identification.)

23 Q      Sir, what I've marked as Exhibit 2 is an
24 excerpt --

25 A      Okay.

Page 30

1  Q      -- from a document. I'll represent that
2  to you. Do you recognize the document?

3  A      No. Actually, I don't.

4  Q      Okay.

5  A      I don't know what the date of it would
6  be. It was November the 17th, so that was during a
7  really tough time at S Cubed.

8  Q      Right.

9  A      And I probably wouldn't have been
10 familiar with it.

11 Q      Okay. Look inside what's been marked as
12 Exhibit 2 at the second page and the third page.
13 There's kind of a table there?

14 A      Correct.

15 Q      Do you -- do you recognize those? Have
16 you seen those before?

17 A      Well, I've seen labor pricing and tables
18 like that before in my career certainly.

19 Q      Okay. How about with regard to the
20 lawsuit that brings us here today? Have you seen
21 tables like that that are relevant to the lawsuit?

22 A      No. I've seen a table that -- with
23 PAR's, that kind of thing. But I haven't seen a table
24 with this kind of labor category pricing and so forth
25 on it.

Page 31

1  Q      All right.

2  A      And I might add that, you know, part of
3  it when I came back to -- in April of -- of 2012 when
4  I came back to the company, it was -- it was chaotic.
5  Cash was in just horrible shape that hadn't been
6  managed correctly, and there was overseas commercial
7  operation that had really hurt the company a great
8  deal. And so my time was all, really almost all of
9  it, probably 90 percent of it was spent trying to
10 raise cash through the sale of equity.

11 Q      Okay. I want to come -- come back to
12 that. I appreciate your bringing it up. Looking back
13 to the 2011 time frame --

14 A      Uh-huh.

15 Q      -- as best you can remember, can you
16 tell me what the sort of organizational structure of
17 Trinetics was. Who was president, that sort of thing?

18 A      In -- well, I need to go back a little
19 bit that will make it clearer for you.

20 Q      Thank you.

21 A      In 2008, I believe it was, we hired
22 Wanda Hale and Alicia Riley who wanted to do OCONUS
23 operations.

24 Q      Better spell that.

25 A      That's O-C-O-N-U-S, all capitals.

Page 32

1  Stands for outside the continental United States.
2  They wanted to do that. They had experience doing
3  that. They'd done that for another company. And I
4  believe that was '08. It -- it -- it wasn't '09. I'm
5  sure it was '08. And they wanted to do that -- that
6  type of work.

7         And because of some of the legal
8  implications of probably wanting to be deeper in the
9  corporate veil and so forth, they recommended -- and
10 because so many things are done differently OCONUS
11 than they are CONUS, legal things and everything else
12 might be worked under a sulfa agreement. They
13 recommended that we form a wholly-owned subsidiary,
14 which became this HRJ International.

15        Wanda was the president of that, and I
16 believe Alicia Riley, who was her partner in this if
17 you will, was a vice president. It was a whole -- it
18 was 100 percent wholly owned though by, at that point
19 in time, Patrick Wolffe Group.

20 Q      Okay.

21 A      And so that was the management there.
22 When I left, Mr. Kirksey became the managing director.
23 He was not an officer of the corporation, of the
24 Patrick Wolffe Group, because he didn't have a
25 security clearance. And he couldn't be on the key

Page 33

1 management personnel, the key -- KMP list that you
2 submit to the defense security service.
3     And eventually Ed Ori became the
4 president of the successor to HRJ International,
5 Trinetics International.  And I don't know the date
6 that he was appointed president or became president.
7 And Mr. Kirksey retained his title, I believe, the
8 whole time of managing director.
9 Q    As managing director, was Mr. Kirksey
10 Mr. Ori's boss?
11 A    Well, you know, that's a good question.
12 Because if you look at the fact that Mr. Kirksey was
13 not an officer and Mr. Ori was; then, naturally, I
14 would think, in a legal sense, that he would be his
15 boss.  But by virtue of the fact that Mr. Kirksey
16 owned a good deal of the corporation, and I'm not sure
17 of exactly how much he owned at that time, but I
18 believe it was still 29 of the corporation.  We had
19 sold about 21 percent to outsiders.  I think in a de
20 facto sense, he was.  I believe anything that happened
21 would have gone through Mr. Kirksey.  But, legally, I
22 would say that Mr. Ori would be, as an officer,
23 president of the corporation.
24 Q    Okay.
25 A    He would be in charge.  So --

Page 34

1 Q    I know you said you didn't remember
2 exactly when this happened, but let me ask it this
3 way.  Perhaps this will help.  Was Mr. Ori ever the
4 president of HRJ International, an entity as
5 distinguished from Trinetics?
6 A    I don't know for sure.
7 Q    Okay.
8 A    I don't know when that name change took
9 place and he was appointed.  I've seen the board
10 minutes when all of that happened; name changes and
11 his appointment and so forth.  But I don't know the
12 timing on that.
13 Q    All right.
14 A    I just don't recall it.
15 Q    And -- and I'm sorry if I've forgotten
16 this.  HRJI became Trinetics through a name change or
17 through an acquisition?
18 A    Became Trinetics International through a
19 name change.  Correct.
20 Q    All right.  And Trinetics International
21 was the subcontractor to URS in the project that
22 brings us here today?
23 A    That is correct.
24 Q    All right.  Ed Ori was president.  Who
25 was vice president?

Page 35

1 A    I don't believe that there was one.
2 Q    Okay.
3 A    And -- and in all of that, my title that
4 I retained was chairman of the board.
5 Q    Right.
6 A    The parent corporation.
7 Q    What were Mr. Ori's responsibilities in
8 general as president?
9 A    He primarily focused on the technical
10 operations side.  Watching over tech ops like support
11 to URS Corporation.
12 Q    Uh-huh.
13 A    And also he was involved quite a bit in
14 business development, making -- developing proposals.
15 Q    Okay.  Don't remember if there was a
16 vice president.  Was there a secretary and/or
17 treasurer?
18 A    There was a corporate secretary.  There
19 was a -- there was not a treasurer.  And I don't
20 recall who the -- who the secretary was.  At some
21 point in time in one of the two business entities;
22 Mr. Kirksey was, in fact, the secretary.  He might
23 have been the secretary originally of Trinetics.
24 Trinetics International, I'm not sure.  I believe
25 Alicia Riley may have been the secretary of that just

Page 36

1 in the back of my mind, and I could be wrong about
2 that.
3 Q    All right.  Do you recall who were the
4 members of the board of directors of Trinetics?
5 A    It -- I think it would depend upon the
6 period of time.  I know that at one point in time -- I
7 believe that I was the only member of the board at
8 some point in time, and I don't know exactly when that
9 occurred.
10 Q    Uh-huh.
11 A    And prior to that, I don't recall who
12 the members were.  And I should.  I just saw documents
13 with it, and I just can't remember.
14 Q    That's fine.  If we look at the time
15 frame of, let's say, 2012, 2011; did Trinetics have an
16 office somewhere?
17 A    Yes.  As a matter of fact, starting in
18 2007 had an office here on Leeman Ferry Road in
19 Huntsville.  And then at some point subsequent to the
20 time that I left in April of 2010, they moved out
21 closer to the airport in the Intergraph complex which
22 was actually a Madison, Alabama address.
23 Q    And was that their most recent office
24 address?
25 A    That's correct.

Tom Houser                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 37

1  Q       Okay.  Can you describe that office for
2  me just generally; how many rooms were in it, that
3  kind of thing?
4  A       Mr. Wilhoite could describe it better.
5  I wasn't there a very long time, but there were really
6  two office complexes separated by a hallway.  And I
7  would say in one of them there was about five or six
8  offices, two or three of whom which were a pretty good
9  size.  And then across the hall, there was a cubicle
10 area and then another five or six areas there.
11 Q       How many full-time employees did you
12 have working at Trinetics in the 2011, 2012 time
13 frame?
14 A       I really wouldn't know that.  I guess
15 that when I came back to work there in -- in April of
16 2012, I think there were about 25 employees.
17 Q       Okay.
18 A       But I'm not certain of that.  I know
19 there were about ten or eleven on the URS contract.
20 And then there was work going on commercially for DHL
21 Corporation in Iraq.
22 Q       Does Trinetics still hold that office
23 space today?
24 A       No, they do not.
25 Q       You gave it up, or the company gave it

Page 38

1  up?
2  A       That's correct.
3  Q       When did that happen?
4  A       Mr. Wilhoite would be best to -- he was
5  the last employee in there.  He'd be the best one to
6  answer that.  But I can -- I can give you a guess that
7  it would probably have been in the fall of 2012.
8  Q       Okay.
9  A       And that -- that's a pure guess.
10 Q       That's fair.  What -- and I want to
11 preface this by saying I'm not trying to probe into or
12 pry into any privileged attorney-client
13 communications.
14 A       Uh-huh.
15 Q       But with that caveat, what was your
16 involvement in Trinetics' determination to file the
17 lawsuit that brings us here today?
18 A       Well, I think I would have to say that,
19 you know, I was heavily involved in that.  I
20 personally have had to bear the -- pay off lines of
21 credit, other financial obligations of the company.
22 And it's been financially devastating and all of that.
23 So I was -- I have to say that I was probably really,
24 to be honest, the lead person that came and met with
25 Kevin and talked about that.

Page 39

1  Q       Okay.  And -- and, again, I don't want
2  to pry into those communications.
3  A       I understand.
4  Q       Do you recall when Trinetics made the
5  determination that it would file a lawsuit against
6  URS?
7  A       I don't recall exactly, but I think it
8  would probably have been around June or July of -- of
9  2012.  That's a guess.  But I'm thinking, based on the
10 timing of other things, that might have been when it
11 was.
12 Q       What are some of the other things that
13 you're recalling that tie that time frame down for
14 you?
15 A       Well, you know, I -- I recall the things
16 that -- the discussions that we had to have about not
17 being able to make payroll and talked to Chad about
18 those things.
19 Q       Uh-huh.
20 A       Those kinds of conversations.  I really
21 felt that we needed to take a voluntary termination
22 for default.
23 Q       Uh-huh.
24 A       The reasons for that.  And, you know,
25 those were the primary things that I remember during

Page 40

1  that period of time.
2  Q       Okay.
3  A       Again, I was -- a lot of what I was
4  focused on was trying to raise money from outside
5  investors through the sale of equity.  And Ed Ori was
6  -- I always felt he was real good at dealing with
7  contracts issues and people wanted contracts and those
8  kinds of things, so he handled a lot of that.
9  Q       Uh-huh.
10 A       He would actually get involved in some
11 phone calls and things like that which were certainly
12 appropriate.
13 Q       Okay.  Prior to Trinetics' termination
14 of the two contracts at issue here; to your knowledge,
15 did Trinetics have any reason to have a claim or a
16 complaint against URS?
17 A       Let me think about that for a moment,
18 please.
19 Q       Sure.
20 A       I don't believe that there was any
21 reason prior to the disputed invoices to file a claim.
22 Q       Okay.  I'm sorry.  Tell me again when
23 the office was closed, the Trinetics office was
24 closed.
25 A       I don't know when that was.  When you

Tom Houser                                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 41

1  depose Mr. Wilhoite, I think he'll be able to tell you
2  exactly; but I'm guessing it was sometime in the fall
3  of 2012.
4  Q        When you closed -- or when Trinetics
5  closed that office; you had furniture in the office,
6  for example.  What did you do with the furniture?
7  A        Correct.  We gave quite a bit of it away
8  to another company that was owned by one of my
9  shareholders.
10  Q        Right.
11  A        I think that was primarily where most of
12  that went.  We -- I think with respect to the
13  furniture, I think most of it went there.
14  Q        You had file cabinets and documents?
15  A        Oh, we did.  We had file cabinets and
16  documents.  And also some of that furniture did go to
17  the successor on our contracts with URS to Bacik
18  Group.
19  Q        B-a-c-i-k, Bacik?
20  A        Yeah.  I had forgotten about that, that
21  they picked up a lot of the furniture.
22  Q        As you recall it, what -- how many file
23  cabinets did you have in the office when you were
24  operating?
25  A        I wouldn't know, but Mr. Wilhoite would

Page 42

1  be able to answer that question.
2  Q        Okay.  In any event; after the office
3  closed, where did those file cabinets go?  Do you
4  know?
5              MR. HEARD:  Let me object to the form.
6  What's the relevance of that?
7              MR. BIDGOOD:  Well, one of the questions
8  that I've identified we're going to get into is
9  document production.  And as you know, I don't believe
10  the 500 pages we've been given constitutes all of
11  Trinetics' documents.
12              MR. HEARD:  Okay.
13              MR. BIDGOOD:  So trying to find out
14  where they are.
15              MR. HEARD:  All right.  Well, then why
16  don't we ask that rather than where the file cabinets
17  went.  I mean, they -- he -- all right.  That's fine.
18  Go ahead.
19  Q        Do you remember the question, sir?
20  A        No, sir.
21  Q        Okay.  Where did the file cabinets go?
22  A        I don't know about the file cabinets
23  themselves.  But the documents that were in the file
24  cabinets were packed into storage boxes and put into a
25  storage unit in Madison, Alabama that I rent over in

Page 43

1  Madison.  And they're in boxes over there in the
2  storage unit.
3  Q        Are they still there today?
4  A        There are a lot of documents in boxes
5  there.  Correct.  And Mr. Wilhoite has on, I would
6  say, several occasions gone there to look for
7  documents that had been requested.  I have to say that
8  the company -- the control within the company, the
9  governance, was not good.  And so I'm certain that a
10  lot of documents probably got either misplaced or
11  lost.  And that would be my -- my opinion.
12  Q        Well, why would you say that?
13  A        Just because it was -- partly because it
14  was pretty chaotic towards the -- the last there.  And
15  in trying to gather up documents and get them boxed
16  and get them labeled and just those kinds of things
17  and move them to that facility.  Partly because we
18  were afraid that the landlord was going to come in any
19  day and preclude us from being able to come in and
20  retrieve our documents.
21  Q        Okay.  What about the computers that
22  were in Trinetics' office at the time it closed?
23  Where did they go?
24  A        Some of the computers went to people
25  personally, and some were given away.  The servers

Page 44

1  were given to -- at least one server, I mean -- I said
2  servers, but I believe it's just one primary server
3  was given to Kord Technologies here in town.
4  Q        Spell that, please.
5  A        Kord, K-o-r-d.
6  Q        Okay.
7  A        And we -- so that was the server that
8  had a lot of our documents and data on it.
9  Q        Was that data backed up anywhere?
10  A        We thought that it was.  They had told
11  us that they'd given us some electronic media with
12  some of that.  And Mr. Wilhoite can tell you what was
13  or was not on any electronic media.  But, in fact, it
14  does not appear to have been backed up, at least
15  appropriately.  And now they're saying that it either
16  became corrupt -- they said it became corrupted,
17  that -- I talked to the CEO and owner of the company.
18  I personally believe that maybe they accidentally
19  wrote over it, that -- that data that was on that
20  server.
21  Q        When you refer to "they," are you
22  talking about Kord?
23  A        Yes.  Uh-huh.
24  Q        Okay.  There was no off-site backup for
25  the data when you were in operation as Trinetics?

Page 45

1  A     Not that I'm aware of.  Obviously, there
2 should have been.  I've always been very careful about
3 that, the governance.  But Mr. Wilhoite could probably
4 tell you more about any off-site backup of -- of our
5 data -- electronic data.  And, potentially, Sandy
6 Gaines could too.  She actually had more of an IT
7 background than anyone else.  And she -- she did a lot
8 of our IT stuff with respect to getting contracts for
9 IT support, our internal IT support, and working with
10 the servers.  And she had -- she had been a CIO for a
11 little -- I think it was a junior college chain in
12 Texas if I'm not mistaken, so knew quite bit about
13 that.  So she would probably come closest to someone
14 who would know about any backups and that kind of
15 thing.
16  Q     Okay.  Where is Sandy Gaines today?  Do
17 you know?
18  A     She's here in town.  I've seen her from
19 time to time at an elementary school with her
20 children.  I have grandchildren at the same school.
21 So --
22  Q     Do you happen to know how to get in
23 touch with her?
24  A     I'm sure that Mr. Wilhoite does.  And
25 it's possible that I have it in my Outlook.  I can

Page 46

1 look.  And if the phone number's still valid, I've got
2 it.
3  Q     At the time -- I think you've told me
4 that at the time Trinetics was closing its doors, you
5 were contemplating the possibility of litigation
6 against URS.  Did I understand that correctly?
7  A     You know, we -- we never really formally
8 closed the doors; so I -- I couldn't really say that
9 we just closed the doors like that.  There was a
10 period of time there when we did contemplate
11 litigation against URS.  As I said, I don't know
12 exactly when that occurred but probably in June or
13 July of 2012.
14  Q     Okay.  With that here -- here's the
15 question I wanted to ask you:  At that time, did you
16 have any discussions with anyone within the company to
17 the effect that we're about to start litigation.
18 Maybe we need to keep these files, or maybe we need to
19 keep these computers or anything like that?
20  A     I don't recall that.  We certainly
21 should have had that discussion and -- but we -- we
22 felt like that that server was in a safe place -- at a
23 good place where it could actually be connected to the
24 internet with somebody knowledgeable enough to allow
25 us to link in and get things out of it.  And I believe

Page 47

1 Mr. Wilhoite even had a link into it to -- to get to
2 things at some point, and you can ask him that
3 question.
4     Part of the issue here that -- that is
5 kind of fuzzy is that in July of -- I think it was
6 the 15th of July, M.D. Anderson decided to try a
7 really kind of experiment with my wife with proton
8 therapy.  And it didn't turn out well.  She just --
9 they said they'd never seen a patient get that sick
10 before.  So I nursed her back to health over a period
11 of many, many weeks and really had even less -- I
12 didn't do go in or anything to work or anything.  And
13 even less contact that I probably did before that --
14 when I wasn't there.
15  Q     When did Mr. Ori leave the company?
16  A     This would be a guess.  But I would say
17 that he left and went to the Bacik Group probably in
18 July or August of 2012.
19  Q     Okay.  And in 2012 what was
20 Mr. Wilhoite's position?
21  A     In 2012, Mr. -- Mr. Wilhoite came on
22 board about the first of February 2012 as a chief
23 financial officer.  My attorney, been a friend of mine
24 for a long time, had told me that he felt that there
25 some things about to be looked at in terms of

Page 48

1 financial transactions; particularly dealing with all
2 of this overseas commercial work where, in Iraq, you
3 basically pay in cash.  And he was very concerned
4 about all of that and other things that were going on.
5     And he -- he never said to me what
6 the source of that was.  But just said, I think you
7 need to get back there.  And I said, well I can't now.
8 I'm really consumed right here at S Cubed, but I will
9 when I can.  And so I had worked before with
10 Mr. Wilhoite.  And asked him to come back and -- and
11 come on board.  And he did about the 1st of February
12 2012.
13  Q     First of February.  And his role was
14 what?  Chief financial officer?
15  A     That's correct.
16  Q     And he stayed in that capacity for as
17 long as he was with Trinetics?
18  A     Correct.  And really beyond that to help
19 us do a lot of things, including data -- getting data.
20 He's done a lot to try to get data and do other things
21 like that.
22  Q     Okay.  In the litigation; URS, through
23 me, has sent to your attorney for Trinetics some
24 discovery requests.  Are you familiar with those?
25  A     He has discussed various discovery

Tom Houser                                      Trinetics International, Inc. vs. URS Group, Inc.

Page 49

1  requests with me from time to time.
2  Q       What role -- and, again, I don't want to
3  get into those communications between you and
4  Mr. Heard.  But what role have you played in trying to
5  gather information responsive to those discovery
6  requests?
7  A       I've played very little because I really
8  didn't have much knowledge of what went where other
9  than taking them to the storage unit.  Mr. Wilhoite
10 was much more familiar with, you know, what we had;
11 what we stored.  Sandy Gaines probably some too
12 because I recall that her daughter at one point was
13 helping us pack storage boxes of different documents
14 and things that would be taken to that storage unit.
15 And my role is real limited in that.  And, again, what
16 my primary focus was to try to raise outside capital
17 and try to save the company.
18 Q       I'm sorry.  I've misled you with my
19 question.  I'm talking now about the time frame
20 between, let's say, in 2014.  What role have you
21 played in 2014 in trying to gather information
22 responsive to our discovery requests?
23 A       Well, about the only role is to try to
24 find out about what was going on with our server.
25 John Wilhoite has been the one that's been really

Page 50

1  active.  Kevin may ask me for something.  I'll call or
2  e-mail John and say, this is something we need to
3  find.  And he'll say, well, I believe that's out in
4  the storage unit.  I'll go there and look for it.  And
5  he's done that on different occasions.
6          I did get concerned about our data that
7  was on that server and couldn't get the IT people to
8  respond at Kord.  So finally I contacted their CEO on
9  two occasions and said, we've got a real problem here.
10 I really need to know what's going on.  I need them to
11 respond and tell us, you know, the status of the data
12 that's on that server that we gave to you.
13 Q       Did they respond?
14 A       The CEO told us that through his --
15 and -- well, I'm not sure it was the CEO or the IT guy
16 now.  But they told us that they thought they had
17 delivered all of that to us on electronic media.  And
18 if they did, it certainly wasn't all of it.  And then
19 the IT guy said that, well, maybe that had become
20 corrupted.  They just did not see our data on that
21 server.
22 Q       You're referred a couple of times to
23 electronic media.  What -- what are you referring to?
24 Is it a hard drive?  Disk?
25 A       That would be something that you would

Page 51

1  transfer data on like a disk, like a -- a DVD or a CD.
2  Q       Okay.
3  A       Or a thumb drive, something like that.
4  Q       Well, do you know in this case what it
5  was that they gave to you?  Was it a thumb drive or a
6  disk?
7  A       I don't know for sure.  Mr. Wilhoite
8  will know.  I believe it was disk, if anything; but
9  I'm not positive.
10 Q       Do you know where that disk is today,
11 assuming it was a disk?
12 A       If there was one, Mr. Wilhoite would
13 know.
14 Q       Okay.  You don't know?
15 A       I don't know.
16 Q       Okay.
17         MR. BIDGOOD:  I should note for the
18 record just so I don't create confusion that these --
19 some of these exhibits are printed two sides.  So when
20 we copy them, we'll need to be careful about that.
21 Let's mark that as 3.
22         (Exhibit Number 3 was
23          marked for identification.)
24         MR. BIDGOOD:  Kevin, I'm sorry, I
25 thought I brought you a copy of these; but,

Page 52

1  apparently, I did not.
2  Q       Mr. Houser, do you recognize what's been
3  marked as Exhibit 3?
4  A       I recognize it as some e-mails.
5  Q       Okay.
6  A       Right.  But I wasn't a party to these.
7          (Exhibit Number 4 was
8           marked for identification.)
9  Q       Do you recognize Exhibit 4?
10 A       I -- I recognize it as time card, a time
11 sheet.
12 Q       Okay.
13 A       No.  I don't know that name.  Yeah.
14 It's one of -- someone by the name of Gary Davis in
15 the period of time of 3/24 to 4/6/2012.
16         MR. HEARD:  Let me hear the dates one
17 more time.
18 A       It's 3/24 to 4/6.  Yeah.  That would be
19 a time sheet period.  2012.
20         (Exhibit Number 5 was
21          marked for identification.)
22 Q       Let me ask you to look at Exhibit 5,
23 please.
24 A       Certainly.
25 Q       And just ask you if you recognize that

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 14 of 31

Tom Houser                                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 53

1  document?
2  A       It isn't one that I've seen before.
3  Q       All right.
4          (Exhibit Number 6 was
5          marked for identification.)
6  Q       How about number 6?  Do you recognize
7  that one?
8  A       No, sir.
9  Q       Okay.
10         (Exhibit Number 7 was
11         marked for identification.)
12 Q       Do you recognize number 7?
13 A       No.
14 Q       Okay.
15 A       I do know that Mr. Heard conveyed to me
16 that, you know, there's a lot of documents that he's
17 had in production from time to time, you know; and
18 this may be part of what he was referring to.
19         (Exhibit Number 8 was
20         marked for identification.)
21 Q       One more.  Number 8, do recognize that
22 one?
23 A       Okay.  No.
24 Q       Okay.
25         (Exhibit Number 9 was

Page 54

1          marked for identification.)
2  Q       And number 9, do you recognize that one?
3  A       Okay.  At some point somewhere, not in
4  this form, I did see this one because I remember the
5  wording -- Chad's wording up here at the top.
6  Q       Okay.
7  A       So I do remember that.
8  Q       Okay.  Hang on to that just for a
9  second.  And let me ask you look at that Exhibit
10 Number 9 and Exhibit Number 4.
11 A       Uh-huh.  Okay.
12 Q       And I want to direct your attention to
13 the bottom.
14 A       Uh-huh.
15 Q       Do you see the footer on number 4?
16 A       I do.
17 Q       1 of 558?
18 A       Uh-huh.
19 Q       And on number 9, 558 of 558?
20 A       Correct.
21 Q       And I'll represent to you that these are
22 the first and the last of the documents that
23 Trinetics -- the group of documents that Trinetics
24 produced to us.
25 A       Uh-huh.

Page 55

1  Q       Presumably 558 pages --
2  A       Uh-huh.
3  Q       -- through a series of e-mails, as we
4  saw in these other exhibits.  And my question for you,
5  sir, is simply:  Have you ever looked at the
6  compilation of documents that Trinetics has produced
7  to URS as part of the discovery in this litigation?
8  A       Not the compilation.  No.
9  Q       Okay.  Do you have any idea what kinds
10 of documents Trinetics had that were not included in
11 the 558 pages that we see represented by Exhibits 4
12 and 9?
13         MR. HEARD:  Let me object to the form.
14 Answer if you know.
15 A       Can you restate that again, please.
16 Q       Yeah.  Do you -- do you have any idea
17 what kinds of documents that Trinetics had at the time
18 it stopped operations that were not included in the
19 558 pages bookended by Exhibits 4 and 9?
20 A       No.  I --
21         MR. HEARD:  Same objection.
22 A       No.
23 Q       You don't have any idea?
24 A       No.
25 Q       Let me get those back from you.

Page 56

1  A       (Witness complies.)
2  Q       Do you know who would know the answer to
3  that question?
4  A       No.  However, I would think that
5  someone, you know, who was closer to the day-to-day
6  administrative actions of the company would -- would
7  have a better idea of the type.
8  Q       Like Mr. Wilhoite?
9  A       Correct.
10 Q       All right.  I want to ask you to look
11 back again, sir, to Exhibit 1, which is the amended
12 notice of deposition; and, in particular, question 27
13 on the exhibit.  Now, feel free to look at that as
14 extensively as you'd like.  But I want to ask you
15 about question 27 or item 27.
16 A       Okay.
17 Q       Are you the Trinetics witness who is
18 prepared to address item 27 in the amended notice of
19 deposition?
20 A       I believe that Mr. Wilhoite, since he
21 dealt with all the documents, administrative documents
22 and so forth from whenever Mr. Ori left, would be most
23 qualified to do that.  I just simply didn't deal with
24 the administrative side of the business with -- given
25 the chaos of trying to raise money, those kinds of

Tom Houser                                          Trinetics International, Inc. vs. URS Group, Inc.

Page 57

1  things at that point.  Up until the time he left,
2  Mr. Ori would have also been -- would have had some of
3  that --
4  Q         Okay.
5  A         -- that material.
6  Q         That's fair enough.  I just -- with the
7  responsibilities divided between you and Mr. Wilhoite,
8  I just want to know whom to ask about that.
9  A         Administratively, they were not divided.
10 I mean, just frankly I can't think of anything
11 administrative really that I was -- that I was doing.
12 Q         Okay.
13 A         He was handling all of the financial
14 documents and so forth.  Occasionally, we would talk
15 about something, maybe some contract division or
16 something like that.  But he worked for a long time to
17 -- oh, gee, probably a year or more just cleaning up
18 things.
19 Q         I'm sorry.  I misled you with my
20 question again.  I didn't mean to.  What I meant to
21 say was:  With the division of responsibilities
22 between you and Mr. Wilhoite --
23 A         Right.
24 Q         -- to speak for the corporation in this
25 deposition --

Page 58

1  A         Uh-huh.
2  Q         -- I was just trying to figure out
3  whether you or he would address that item 27.
4  A         Since it has to do with documents, which
5  obviously have to do with administrative type of
6  things; he would be most qualified to address
7  number --
8  Q         Fair enough.
9  A         -- 27.
10 Q         Thank you.  Doing okay?  Need to take a
11 break?
12 A         I'm fine.
13 Q         Okay.  Let me ask you about a few
14 others.
15          MR. BIDGOOD:  Off the record.
16          (Discussion off the record.)
17          (Exhibit Number 10 was
18          marked for identification.)
19 Q         And, Mr. Houser, I'm going to ask you to
20 look through Exhibit 10 and tell me if you recognize
21 that document, sir.
22 A         (Witness complies.)  I don't, but it's
23 possible that at some point in time I might have
24 looked at it or read it.  But I don't know what the
25 date on it would be.  It was sometime March of '11.  I

Page 59

1  doubt that I would have been exposed to that
2  document --
3  Q         Okay.
4  A         -- since I wasn't there.  And Mr. Ori
5  signed it for the company.
6  Q         Fair enough.
7          (Exhibit Number 11 was
8          marked for identification.)
9  Q         Let me ask you to look through exhibit
10 11, sir, and tell me if you recognize that document.
11 A         Okay. (Witness complies.)  No, I do not.
12 Q         Okay.
13          (Exhibit Number 12 was
14          marked for identification.)
15 Q         And let me ask you to look through
16 Exhibit 12.
17 A         Okay.
18 Q         Tell me if you recognize that document.
19 A         (Witness complies.)  No, I don't.
20 Q         Okay.  Let me try this a slightly
21 different way.  We're here today because URS has been
22 sued by Trinetics.
23 A         Correct.
24 Q         Agree with that?  And the events giving
25 rise to the lawsuit that Trinetics has brought against

Page 60

1  URS arose from some contractual relationships between
2  the two companies.  Would you agree with that?
3  A         Yes.
4  Q         Tell me what you understood or
5  understand about the contract or contracts between
6  Trinetics and URS that eventually led to this lawsuit.
7  A         Well, the primary thing was that we
8  were -- Trinetics was notified in, I believe it was,
9  August of 2012 that some invoices would not be paid
10 until such time as a determination could be made as to
11 the extent that URS had suffered from an equitable
12 adjustment from the government for things that URS --
13 I'm sorry -- that Trinetics had or had not done.  That
14 was the first time really that I was aware of, and I
15 don't know about Mr. Wilhoite that there were
16 performance issues that might impact the payment of
17 those invoices.
18 Q         Okay.  I want to back up even before
19 that.  How many contracts, to your knowledge, did
20 Trinetics have with URS?
21          MR. HEARD:  Object to the form.  Over
22 the entire period of time?  In this period of time?
23 In what period of time are we talking about?
24 Q         How many contracts did Trinetics have
25 with URS that led to the lawsuit that brings us here

Page 61

1  today?
2  A       I think we will need to define -- I
3  probably can't answer your question well -- but to
4  define contracts because I believe that in this case
5  there's an overarching contract, an ID/IQ that we
6  talked about earlier, and then these -- I don't know
7  if you'd call them task orders or what y'all would
8  refer to them as -- underneath that.  And so I don't
9  know exactly how many of those there were.  I know
10 there's an overarching contract.  And then under that,
11 I don't know whether there's a single task order that
12 may have had a base year and some options or exactly
13 what we had there.  In that case, Mr. Ori would be the
14 one who would probably be very knowledge about it.
15 Q       Okay.
16 A       That was his area of expertise.
17 Q       Okay.  And I'll ask him about them.
18 Just as you understood it in your own terms, what was
19 it Trinetics had agreed to do for URS under these
20 contracts?
21 A       To provide a certain number of people
22 with certain skills in Afghanistan.
23 Q       And what would those people do?
24 A       I'm not totally familiar with it, but
25 there were technician-type things.  Like there was

Page 62

1  electrical engineer.  Of course, that's not a
2  technician.  Other things that supported, I believe,
3  the base operations there to support things like the
4  maintenance on the -- on the base and, essentially, I
5  guess, improvements to things on the base and those
6  kinds of things.
7  Q       Now, as you understood it; was Trinetics
8  obligated to provide an identified quantity of people
9  or just provide people as URS requested them?
10         MR. HEARD:  Object to the form to the
11 extent it calls for a legal conclusion.
12 Q       Go ahead.
13         MR. HEARD:  Go ahead.
14 A       Okay.  It was my understanding that we
15 were to provide a level of effort, some level of
16 effort of people in those certain skill categories as
17 I said before.
18 Q       Okay.  Do you recall how many people
19 Trinetics was to provide?
20 A       If I'm not mistaken, from a document
21 that I saw, I believe there were 11.
22 Q       And do you recall what period of time
23 you -- Trinetics was to provide those people?
24 A       No, I don't.
25 Q       Okay.  Do you remember whether

Page 63

1  Trinetics, in fact, provided 11 people or whatever the
2  number was as required by the contract?
3  A       Until recently, I did not know; but I
4  did see a document that indicated that it varied from
5  perhaps eight to a full 11.
6  Q       Do you have an understanding of why
7  Trinetics did not provide the full 11, or whatever the
8  number was, of people?
9  A       I don't know.  Mr. Ori would know the
10 answer to that I'm sure.
11 Q       Mr. Ori?
12 A       Correct.
13 Q       Okay.  You say you saw a document that
14 refreshed your recollection on that?
15 A       Yes.
16 Q       What was that document?  Do you recall?
17 A       I don't know what it would have been
18 entitled; but it was to show, on a month-to-month
19 basis during the contract, whether there were, in
20 fact, issues on the contract or not.  Showed the
21 staffing that -- how many out of the 11 each month and
22 then whether there were any issues noted in a
23 particular month.
24 Q       During the time that Trinetics was
25 performing its contracts with URS, were you made aware

Page 64

1  of any problems with Trinetics' performance?
2  A       No.  When I -- when I came back to --
3  when I came back in April of 2012, I believe that
4  Mr. Ori told me that we were short one or two.  I just
5  can't remember.  But seems like he -- we had some
6  conversation, and he told me about that he was trying
7  to hire for; but I'm not certain of that.
8  Q       Okay.  Do you have a recollection
9  whether Mr. Ori told you why you were short one or two
10 people or whatever it was?
11 A       I don't recall that.
12 Q       Okay.
13         (Exhibit Number 13 was
14         marked for identification.)
15 Q       Mr. Houser, take a look at Exhibit 13,
16 if you would.  Tell me if you recognize that.
17 A       (Witness complies.)  I do.
18 Q       What do you recognize it to be?
19 A       It's a cure notice.
20 Q       Okay.  Do you recall receiving it?
21 A       I recall that Mr. Ori came to see me and
22 to talk to me about it.
23 Q       Okay.  What do you recall about that
24 conversation?
25 A       Perhaps I just need to read through

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 17 of 31

Tom Houser                                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 65

1  this.  I may have a better recollection.
2  Q        Take all the time you want.
3  A        Okay.  Okay.
4  Q        My question to you was:  Do you recall
5  what you and Mr. Ori discussed about this letter?
6  A        I -- I vaguely recall that we talked
7  about what our options were, including doing a
8  voluntary termination for default.  And I'm -- I'm
9  fairly certain that at that point in time I still had
10 one or two leads on outside equity investment that was
11 coming down to the end of that.  There was going to be
12 an outcome one way or the other and so that if that
13 couldn't happen, that outside investment; then,
14 potentially, our best course of action might be a
15 termination for default.  Being that if we didn't and
16 it went further along, it would have a worse impact on
17 URS and the government and our employees.  So that --
18 potentially that might have been the best course of
19 action.
20 Q        Okay.
21          MR BIDGOOD:  Let's go off the record.
22          (Discussion off the record.)
23 Q        Mr. Houser, we're back on the record.  I
24 want to ask you about some discovery responses that
25 Trinetics has given to URS's request in this

Page 66

1  litigation.  And, in particular, I want to ask about
2  plaintiff Trinetics International, Inc.'s response to
3  defendant URS Group, Inc.'s first interrogatories and
4  requests for production of documents and things.
5  A        Uh-huh.
6  Q        That's the document that Mr. Heard is
7  showing you right now.
8  A        Okay.
9  Q        Have you read through these answers --
10 questions and answers?
11 A        I don't know for sure.
12 Q        Okay.
13 A        Yeah.  I have seen that.  Uh-huh.  Yes.
14 I think -- I think I have actually.  I know I've read
15 that and that.  And this I've read.  Yeah.  That
16 appears to be what I read.  Yes.  Yeah.
17 Q        Well, let me ask the question a slightly
18 different way.  Are you prepared today to testify
19 under oath that these are true and accurate answers on
20 behalf of Trinetics?
21 A        On the advice of my counsel, I would be
22 willing to do that.  Yes.
23 Q        Okay.  Let me ask you to look at
24 interrogatory response number one, which begins on
25 page two --

Page 67

1  A        Uh-huh.
2  Q        -- and goes over to page three.  Just
3  read that to yourself.  You don't need to read it out.
4  A        Okay.
5  Q        Let me know when you've done so.
6  A        (Witness complies.)  Okay.
7  Q        Have you read it?
8  A        I have.
9  Q        Okay.  You eluded to this series or
10 sequence of events in your answer just before we took
11 a break.  And I'd like to ask you just to elaborate on
12 this sort of history as it's set out here in
13 interrogatory number one.  I'm -- tell me a little bit
14 more about how it is that Trinetics came to be, in
15 this situation, described in the interrogatory
16 response and what the impact on that was to you of
17 performing the contracts.
18 A        Well, I think if we go back a little
19 bit; there were operations ongoing of commercial
20 operations in Iraq for DHL Corporation.  Their
21 customer was Exxon Mobile, as I recall.  And it was
22 moving supplies to the oil fields that were beginning
23 to be exploited and proved and those kinds of things.
24 And we were doing a lot of work for DHL over there in
25 the transportation, going from the port of, I think

Page 68

1  it's called Umm Qasr, into storage areas or to the oil
2  fields there.  And so the -- that work that was
3  ongoing relates to these invoices here, particularly
4  ones the ones with -- with DHL.
5          There was another -- I don't know that
6  this -- I don't believe this says what companies.  But
7  there was another invoice with Louis Berger
8  Corporation, which had to do with a government
9  operation which was the retrograde of equipment that
10 the government wanted to get out, the U.S. Government,
11 as quickly as they could because of, I'm assuming, the
12 lack of a status of forces agreement and the fact that
13 we were going to, you know, totally leave the country
14 there.  That may not answer your question.
15 Q        Well, I think it's -- I think you're
16 headed toward the answer; but I'm not following you.
17 A        Uh-huh.
18 Q        In the response to number one,
19 interrogatory number one; I don't see any reference to
20 DHL, so I didn't quite follow what you were saying.
21 A        That's some background that's not in
22 here.  It says, state in detail why we voluntarily
23 ceased operating under that.  And it was simply a
24 matter of we didn't have the cash to continue
25 operating --

Page 69

1  Q        And is that because -- sorry.  Go ahead.
2  A        -- as a viable entity.  And a lot of
3  that has to do with the tremendous amount of cash --
4  and literally of cash where you have to deal with cash
5  in Iraq -- of going to Iraq for those operations.  And
6  then DHL Corporation, really for no stated reason,
7  just decided they weren't going to pay us.  Actually
8  sent us notification they were paying us.  They just
9  owed us $1.3 million.
10 Q        Okay.
11 A        Sent us an e-mail and said, we're going
12 to pay you Monday morning, I think it was Monday
13 morning, 300,000.  The other million will follow.
14 That would have really fixed a whole lot of this.  And
15 for whatever reasons, I have some thoughts of my own
16 why, they decided they wouldn't pay us and just strung
17 us along for a while and -- and never did pay that.
18 Q        So in general terms, would that have
19 been in early 2012 when you were having these problems
20 with DHL?
21 A        We started -- as I recall, and I could
22 be wrong, but I think that they were trying to -- real
23 hard to say the dates.  But it was just some e-mails
24 and phone calls.
25 Q        Uh-huh.

Page 70

1  A        I'm thinking around October.  I do
2  remember because I was at M.D. Anderson with my wife.
3  That's right.  And I remember talking on the phone
4  about when is DHL going to pay this?  Can we get an
5  e-mail from them showing they're going to pay it,
6  which we did eventually.  And that would have been,
7  let's see here, probably in October of 2012.  That
8  conversation was going on with DHL about getting paid.
9  And that was -- we just never got paid, although they
10 promised it to us directly in writing.
11 Q        Do you remember when Trinetics defaulted
12 on the contract with URS?
13 A        With URS?
14 Q        Yes, sir.
15          MR. HEARD:  Object to the form.
16 A        When we did the termination for default?
17 Q        Uh-huh.
18 A        We did the termination for default, I
19 believe it would have been, in May, I believe, of
20 2012.
21 Q        Okay.  Let me give you a document.
22          (Exhibit Number 14 was
23          marked for identification.)
24 Q        And I've given you, Mr. Houser, Exhibit
25 14 just to kind of help us fix a point in time.

Page 71

1  A        Okay.
2  Q        You take all the time you want to read
3  it, but I just want to focus on the date.
4  A        Okay.  Now -- well, I just stated to you
5  that I thought we took that voluntary termination for
6  default in May; but it must have been happened in
7  June.
8  Q        Okay.  And that helps.  But that still
9  leaves me a little bit unclear about how problems with
10 DHL in October, four or five months later, affected
11 your ability -- the company's ability to perform its
12 contract with URS.
13 A        Well, that cash flow of $1.3 million
14 would have been the difference between night and day
15 in terms of cash.  I mean, we would have been able to
16 make our payroll.  Certainly would have been our
17 priority to have made that payroll and hopefully to
18 continue to operate.
19 Q        Well, the cash part of it I'm following.
20 It's the timing I'm unclear on.  Were you having these
21 problems with DHL prior to June of 2012?
22 A        Oh, yes.  As I said a moment ago, we --
23 I'm pretty sure that we were trying to get them to pay
24 their invoices, I believe, as early as October of '11.
25 Q        Of '11?  Okay.  All right.  That helps.

Page 72

1  A        I'm pretty sure that was when I was at
2  M.D. and having conversation about how we're going to
3  get these guys to pay.
4  Q        So it was October of '11 you started
5  having problems, or you were having problems with DHL?
6  A        I believe that's about when it was.  And
7  Mr. Wilhoite would know that more specifically than I
8  would.
9  Q        Now, in the interrogatory answer that we
10 were looking at in response number one, there's a
11 reference to factoring out by Mr. Kirksey?
12 A        Correct.
13 Q        And elaborate on that for me if you
14 would.  Tell me what you mean by "chose to factor
15 receivables."
16 A        Let me ask a question.
17 Q        Sure.
18 A        Are you familiar with factoring?  I'm
19 sure you are.
20 Q        In general, but --
21 A        Mr. Kirksey was -- he had the authority
22 to factor receivables for Trinetics International.
23 However, he factored in two receivables that were --
24 pertained to Triham, LLC, which was a jointly-owned
25 subsidiary with an Iraqi company.  For certain efforts

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 19 of 31

Tom Houser                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 73

1  over there, you had to have an Iraqi partner.  And he
2  factored those Triham -- work that Triham had
3  performed, even though he wasn't authorized to do
4  that; only Trinetics International.
5        Now, there is one -- you know, a lot of
6  obvious possible explanations why he did that; and
7  some of them, clearly, would not be good.  One thing
8  that he may have done, because sometimes I notice that
9  he didn't pay a lot of attention to detail, he may
10  have thought that since Hamco was half owned by
11  Trinetics International, that was fine; he could go
12  ahead and do that.
13  Q       Uh-huh.
14  A       But, clearly, legally and ethically, he
15  couldn't do that.
16  Q       Okay.  Was he factoring these
17  receivables in order to get cash for Trinetics to meet
18  its needs --
19  A       Sure.
20  Q       -- for operations?
21  A       Correct.
22  Q       Okay.  To your knowledge, have any of
23  URS's or any of the receivables that you contend are
24  owed from URS, have they been factored?
25  A       I don't believe that any URS receivables

Page 74

1  were factored.
2  Q       Or assigned in any way?
3  A       I don't -- I don't believe so.  To best
4  of my knowledge, they're not.  Mr. Wilhoite will know
5  that for sure.
6  Q       Okay.  Do you remember you mentioned a
7  few minutes ago minutes that there were a few months,
8  in any event, in which Trinetics' staffing was less
9  people than you thought were required by contract.  Do
10  you remember that discussion?
11  A       Right.  I think it was particularly
12  early on in the period of performance.
13  Q       Was that understaffing attributable to
14  the fact that Trinetics was in a cash flow problem?
15        MR. HEARD:  Object to the form.
16  A       I don't -- I don't believe that would be
17  the issue.  Because at that point in time, you know --
18  and I -- and I'm just guessing.  I think that was
19  probably around March or April of -- probably April of
20  2011 on -- that the cash flow problems hadn't reached
21  that type of a crisis at that point.
22  Q       Okay.  If you had to pick a time when
23  you'd say the cash flow did reach a crisis, when do
24  you think that would be?
25  A       Well, I'd gone back to -- to work at --

Page 75

1  let me think about that.  Probably -- probably around
2  December, January of -- December of '11, January of
3  '12, sometime in there.  That's kind of a guess, but
4  I'm just thinking about the conversations I had with
5  Mr. Kirksey from time to time and trying to get him
6  to, you know, collect this DHL invoice.  DHL, by the
7  way, was -- I mean, we considered suing them for that.
8  But there was some fine print in their contract which
9  meant that it had to be tried in English court.  And
10  looking into that, it was nearly impossible to pursue
11  anything in my opinion.
12  Q       All right.  Okay.  Let's go back now to
13  Exhibit 13, which was --
14  A       Well, this one is not marked; but I
15  think it's --
16  Q       Here.  Here you go.
17  A       Okay.
18  Q       In the second sentence of this letter to
19  Mr. Ori --
20  A       Uh-huh.
21  Q       -- Mr. Becker wrote "In the past month,
22  you have informed us of cash flow issues that you have
23  been experiencing."
24  A       Uh-huh.
25  Q       "These cash flow issues have resulted in

Page 76

1  your inability to meet your payroll obligations on two
2  separate occasions."  Do you see those two sentences?
3  A       Yes, sir.
4  Q       Did I read them correctly?
5  A       Correct.
6  Q       So these were sort of the status of the
7  cash flow crisis, if you will, as of May or June 2012,
8  the crisis that you've been describing for me?
9  A       It had become very critical at that
10  point in time.
11  Q       Okay.  Were you consult -- well, let me
12  rephrase that question.  What were you doing at this
13  time about Trinetics' cash flow crisis?
14  A       Attempting to raise cash through sale of
15  equity.  However, this is dated June 1st; and my wife
16  had the pneumonectomy, a lung removed, on June, I
17  mean, May 29th.  So I would have been pretty much out
18  of the loop; sleeping in the hospital for several days
19  and stuff here.  So, you know, I wouldn't have had a
20  lot to do with this.
21  Q       Well, that's certainly understandable.
22  And I'm not trying to suggest you should have been
23  doing more or different or anything.  I'm just trying
24  to --
25  A       Yeah.  I was on the phone with them to

Page 77

1  be honest with you.
2  Q        Okay.  Let's look then at Exhibit 14 --
3  A        Okay.
4  Q        Thank you.  -- which was Mr. Ori's
5  response.
6  A        Uh-huh.
7  Q        Did you -- do you remember if you
8  consulted with Mr. Ori about this response before it
9  went out?
10  A        I don't remember.  But I will tell you
11  that it is likely that I did.
12  Q        Okay.  In the second paragraph there is
13  a reference to recommended filing under Chapter 11.
14  Do you see that?
15  A        Yes.
16  Q        And I think you told me, but I just want
17  to confirm there -- to your knowledge, there's been no
18  filing under Chapter 11 or any other bankruptcy
19  provision?
20  A        That's correct.  Part of that was
21  because, under certain circumstances, we would have
22  been better off, in terms of raising equity, to have
23  actually been in a Chapter 11.
24  Q        Uh-huh.  Do you remember why the company
25  did not file Chapter 11?

Page 78

1  A        I -- I don't recall exactly why.  There
2  were reasons, but it's been so long that I don't -- I
3  don't recall why.
4  Q        Okay.
5  A        And I -- well, I will say this:  That,
6  obviously, to do that; you need to be able to have a
7  -- a reorganization plan going forward that's real,
8  that's executable.  And while we put one together that
9  was real and executable, it depended upon the infusion
10  of that capital from the sale of equity.  And when we
11  were unable to sell the equity, it certainly was no
12  longer a viable plan.
13  Q        Can you elaborate on that?  What was the
14  equity you were planning to sell, and what happened to
15  that plan?
16  A        We were going to sell up to -- well,
17  where outsiders would have held 80 percent or so of
18  the -- of the stock.  I don't know what they held at
19  that point in time, but they -- we -- I had said that,
20  you know, we'll sell up to 80 percent of the company.
21  We had a -- DHL strung us along with the promise of
22  other contracts, commercial contracts there; and we
23  felt like that was a good way forward.  However, they
24  still weren't paying us.  But it was a promise of --
25  of fairly large --

Page 79

1  Q        Uh-huh.
2  A        -- large contracts actually.  And I
3  think potentially they did that to get us to quiet
4  down about the 1.3 million that they owed us.
5  Q        Exhibit 14, Mr. Ori's letter of June 11?
6  A        Uh-huh.
7  Q        My reading of it is that it -- it paints
8  a fairly optimistic picture of Trinetics' ability to
9  keep going.  Is that a fair reading as of June 11,
10  2012?
11       MR. HEARD:  Object to the form.
12  A        I would say that it is moderately
13  optimistic.  We had had some pretty good conversations
14  with angel investors, outside investors --
15  Q        Uh-huh.
16  A        -- and had really come to a point there
17  where we were unable to raise the $500,000 of equity
18  that we -- we wanted to raise.  But --
19  Q        I'm sorry.  You say you had?
20  A        We had not been able to raise the
21  500,000.
22  Q        Had not.
23  A        And that's what really the plan was
24  built upon raising that 500,000.  And then we had a
25  receivable from the U.S. government which was also

Page 80

1  part of that plan.
2  Q        Okay.  A receivable from the United
3  States government on another project?
4  A        That's correct.
5  Q        Okay.
6  A        And they actually -- and Mr. Wilhoite
7  can give you the details on that because he dealt with
8  it every day.  They actually failed to pay most of
9  that.
10  Q        Okay.
11       (Exhibit Number 15 was
12       marked for identification.)
13  Q        What I'm going to hand you now is
14  Exhibit 15 --
15  A        Uh-huh.
16  Q        -- which is actually two e-mails --
17  A        Okay.
18  Q        -- from you.  Take a moment to read over
19  those if you would.
20  A        All right. (Witness complies.)  All
21  right.
22  Q        Can you identify these, please.  Do you
23  recognize these documents?
24  A        Yes, I do.
25  Q        All right.  What are they?

Page 81

1   A        The two e-mails that are -- we -- we
2   were asked to confirm in writing the voluntary
3   termination.  And that was the purpose of them.  And
4   then the second one was to correct the -- the date
5   that it would be effective.
6   Q        Okay.  Let me ask a couple of specific
7   questions about Exhibit 15.  Thinking back to Exhibit
8   14, the June 11 letter --
9   A        Uh-huh.
10  Q        -- two days earlier where it looked like
11  you might be able to -- the company might be able to
12  pull things together.  And then Exhibit 15 two days
13  later, you're confirming a telephone conversation in
14  which you've told them you're voluntarily terminating
15  the contract.  And with appreciation for everything
16  else you had going on at the time --
17  A        Right.
18  Q        -- what happened in these two days that
19  changed the company's outlook?
20  A        I don't know for certain, but I -- I
21  think it was -- there was probably an investor -- I
22  remember there were two that we were -- felt like we
23  were pretty close on.  And one in particular I can't
24  remember the name.  The other one was I Three
25  Corporation.  But I think that the one or both of

Page 82

1   those fell -- fell out, and I think it was probably
2   one of those.  And I can't remember the name of the
3   group there.  I know the people in it, but I can't
4   remember the name of the group.
5   Q        Okay.
6   A        And I think that probably fell out in
7   that period of time.  We were -- we were doing
8   probably two or three of those at once or moving those
9   along.  And -- and then we got bad news, and I believe
10  it was that second one that probably came along and
11  said they weren't going to invest.
12  Q        Okay.  In the earlier of the two e-mails
13  in Exhibit 15 --
14  A        Uh-huh.
15  Q        -- you wrote, "This is to confirm, as
16  stated in the telecon today at 1:00 p.m."  Do you see
17  that?
18  A        Uh-huh.
19  Q        What do you recall of that telecon?
20  A        I don't recall a lot except that, you
21  know, that we had told them that we were going to
22  voluntarily terminate the contract.  And I want to
23  say, but I'm not certain it's correct, that we
24  explained our reasons for doing that that were outside
25  of the cash flow issues, that the impact on our

Page 83

1   employees was going to be bad in terms of benefits and
2   pay and all of those if we didn't do something
3   quickly.
4   Q        Uh-huh.
5   A        And then the impact on URS and their
6   customers bad.  And, obviously, in a combat zone; it's
7   worse than anything to have a -- any type of a place
8   where you default and don't do the job that you're
9   supposed to be doing.
10  Q        Okay.  Now, what was the reason for the
11  second e-mail where you change the termination from
12  immediately to Friday, June 15th?
13  A        I'm not certain of the reason for that.
14  And I -- I want to say, but I could be totally wrong,
15  that we were asked to move it to that date so that we
16  wouldn't be in the middle of a -- of a week or a pay
17  period, but I'm not certain of that.  I kind of, in
18  the back of my mind, remember -- and, you know,
19  Mr. Becker may be able to confirm that or deny it --
20  that they said they wanted to do it at the end of the
21  week because, obviously, it would be a lot cleaner,
22  even if you were halfway through a payroll period.
23  Q        Okay.  Look back down, if you would, at
24  the first e-mail where you wrote "Trinetics is
25  voluntarily terminating, effective immediately."  Do

Page 84

1   you see that part of it?
2   A        Correct.
3   Q        What did the phrase "voluntarily
4   terminating" mean to you at the time?
5           MR. HEARD:  Object to form.
6   A        Yeah.  It would -- it would mean to me
7   that we were not being terminated for cause or
8   terminated for default by URS; but, rather, that we
9   were voluntarily terminating the contract.
10  Q        And -- and in your position with regard
11  to the company and with regard to these contracts, did
12  you personally believe that Trinetics had a right to
13  voluntarily terminate these contracts?
14          MR. HEARD:  Object to the form.
15  A        I -- I don't -- as I've said earlier,
16  I'm not great in contracts.  I don't know the answer
17  to that question.
18  Q        Okay.  But in any event as we see in
19  Exhibit 15, you did advise URS that Trinetics would
20  not be performing after June 15; right?
21  A        That is correct.
22  Q        And that's because you could not
23  perform?
24  A        That's right.  We did not have the cash
25  to continue.

Page 85

1    (Exhibit Number 16 was
2    marked for identification.)
3  Q    All right.  Mr. Houser, handing you now
4  -- I see you've signed the interrogatory answers.
5    MR. BIDGOOD:  Do you want to go ahead
6  and make those an exhibit, Kevin?
7    MR. HEARD:  If you want to, that's fine.
8  I have no problem with that.
9    THE WITNESS:  I didn't know about the
10  date.
11    MR. HEARD:  Just let him decide if wants
12  to make it an exhibit or not.
13    THE WITNESS:  All right.
14  Q    Let's take a look at Exhibit 16, sir.
15  A    Okay.
16  Q    Two-page letter.  Take -- take all the
17  time you want to read over it.
18  A    Okay.  (Witness complies.)  Okay.
19  Q    Do you recognize Exhibit 16?
20  A    Yes, I do.
21  Q    And what do you recognize it to be?
22  A    As stated, the conditions -- terms and
23  conditions for the termination for default going
24  forward.
25  Q    Okay.  Did you receive this letter from

Page 86

1  URS on or about June 13?
2  A    I believe so.
3  Q    Okay.  And did you discuss the letter
4  with URS before it came to you, or do you remember?
5  A    I don't remember.
6  Q    All right.  In any event, there are a
7  series of bullet paragraphs in the letter?
8  A    Uh-huh.
9  Q    And then at the very end of the letter,
10  it says, "I accept and concur with the terms of the
11  letter above."  And below that is your name.  And is
12  that your signature?
13  A    That is correct.
14  Q    Okay.  And then it appears, but I'd like
15  for you to confirm this for me, that you initialed
16  each of the bullet paragraphs?
17  A    That is correct.
18  Q    Indicating your agreement with them?
19  A    Yes.
20  Q    Okay.  Do you still agree with all of
21  these points today, the letter and all of these bullet
22  points you initialed?
23  A    Yes.  That those were the terms and
24  conditions going forward to effect the voluntary
25  termination.

Page 87

1  Q    Do you remember if you discussed this
2  letter with anybody from URS at or about the time that
3  you signed it?
4  A    I don't recall.  I -- I just don't
5  recall.
6  Q    Okay.
7  A    We may have discussed that with
8  Mr. Becker.  But, again, I'm just not sure whether we
9  did or not.
10    (Exhibit Number 17 was
11    marked for identification.)
12  Q    Exhibit 17 is a letter dated January 22,
13  2013, with some attachments.  Take all the time you
14  need to read through it, and let me know when you've
15  done that.
16  A    (Witness complies.)  Okay.
17  Q    Do you recall getting that letter, sir?
18  A    I don't recall.  It may be that --
19  that John Wilhoite received it at that address since I
20  was no longer at that address and called me to talk to
21  me about it.  Or we occasionally went to lunch.  But I
22  don't personally, you know, recall receiving it.
23  Q    Okay.  Explain what you meant when you
24  said you were no longer at this address.
25  A    Recall that I went back to S Cubed in

Page 88

1  October of 2012.
2  Q    Okay.  As of January 2013 though, you
3  were still the majority shareholder of Trinetics
4  International, Inc.; is that right?
5  A    That's right.
6  Q    Okay.
7  A    It was defunct for all intents and
8  purposes, but I was the majority shareholder.
9  Q    Okay.  Even though you don't recall
10  getting the letter at or about the time it was
11  written, do you recall having reviewed it since --
12  since that time?
13  A    At one point since that time, I have.
14  Yes.
15  Q    Do you remember when that was?
16  A    No, I don't.
17  Q    Okay.  Let me ask you to look back at
18  the back.
19  A    (Witness complies.)  Okay.
20  Q    The -- two pages from the back and three
21  pages from the back, there is a table there?
22  A    Right.  I am on that page.
23  Q    Do you recall ever having seen this
24  before?
25  A    Not until -- until about day or a two

Page 89

1  ago.
2  Q      Okay.  Do you know whether the
3  information contained in these two tables is accurate
4  or not?
5  A      I would not know.
6  Q      Who on behalf of Trinetics would know
7  that?
8        MR. HEARD:  Object to the form.
9  A      Mr. Ori would probably be the most
10 likely to know.
11 Q      All right.  Do you recall whether
12 Trinetics responded to the January 22, 2013, letter?
13 A      I don't know.  The only person that --
14 that potentially would know will be Mr. Wilhoite.
15 Q      Okay.  Setting aside whether you saw the
16 letter or not, did you have an understanding in
17 January or February 2013 that URS was expecting
18 Trinetics to pay URS money?
19 A      I didn't from this, but I do know that
20 Mr. Wilhoite informed me of that.  And I don't know
21 the timing, but it potentially was around that time.
22 Q      What do you recall of what Mr. Wilhoite
23 and you discussed about that?
24 A      I really don't recall a lot except that
25 we were surprised that there was a -- a request for an

Page 90

1  equitable adjustment because neither one of us could
2  ever recall a time when we received a -- a cure notice
3  or a show cause notice at all other than the one, of
4  course, that was issued in June of 2012 --
5  Q      Uh-huh.
6  A      -- when we were failing to make payroll.
7  Q      Okay.
8  A      And -- and that's about the extent of
9  it.
10 Q      Do you recall being aware, in or about
11 August of 2012, that the government had requested an
12 equitable adjustment from URS?
13 A      I don't believe I was aware of that
14 until I read some documents here very recently that
15 they -- that the government had done that.  And I was
16 surprised because there had never been, to my
17 knowledge, a show cause or a cure notice issued to --
18 to us.
19 Q      When do you recall, as best you can
20 recall, first learning that the government was
21 requesting an equitable adjustment from URS?
22 A      I don't know exactly, but I think it
23 would probably be likely that it -- if Mr. Wilhoite
24 was aware of that, he would certainly have informed me
25 of it at that time.  But I don't know whether he was

Page 91

1  aware of it or not.  I assume that he was.
2  Q      Okay.
3  A      But I could be wrong.
4  Q      Look back, please, at Exhibit 9 that we
5  marked earlier today.
6  A      Uh-huh.
7  Q      This was the one marked page 558 --
8  A      Right.
9  Q      -- of 558.
10 A      Uh-huh.
11 Q      And take a moment to read over that --
12 A      Okay.
13 Q      -- e-mail.
14 A      Uh-huh.  (Witness complies.)  Okay.
15 Q      Does that refresh your recollection
16 about when you first learned that the government was
17 demanding an equitable adjustment from URS?
18 A      Well, it was addressed to John.  I don't
19 believe I'm an addressee on it.  But I think this was
20 the type of thing that he would certainly have called
21 me about.  That's what I'm saying is I don't
22 specifically remember, you know, being notified by
23 him; but I'm certain that that's something that John
24 would have called me and said that they were demanding
25 an equitable adjustment.

Page 92

1  Q      Okay.
2  A      It's probably the type of thing that we
3  would have actually gone to lunch and talked about,
4  the circumstances behind the equitable adjustment and
5  those kinds of things.  There was a point in time
6  there where John and I began to talk about whether
7  there were PAR's that existed for performance or lack
8  thereof and those kinds of things.  And I even talked
9  to Ed Ori about whether there were any out there that
10 anyone was aware of that had to do with that.  And at
11 that point in time, and I'm not saying it was exactly
12 August, but I think it probably around that point in
13 time; we weren't aware of anything that the government
14 had issued in terms of a PAR or anything.
15 Q      To your knowledge around August of 2012
16 time frame, did anybody on behalf of Trinetics
17 communicate to URS to the effect, hold on, if there's
18 going to be an equitable adjustment, we need to be
19 involved in the negotiation of it?
20 A      I don't believe that anyone did that.  I
21 think you should confirm that with Mr. Wilhoite; but I
22 don't believe so because I think I would be very much
23 aware of that if that had happened.
24 Q      Okay.
25 A      If they -- I should correct that and say

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 24 of 31

Tom Houser                                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 93

1   if they talked to me.
2   Q        Okay.
3            (Exhibit Number 18 was
4            marked for identification.)
5   Q        Take a look, please, at Exhibit 18; and
6   let me know when you've had a chance to read it.
7   A        Okay.  (Witness complies.)  Okay.
8   Q        Have you had a chance to look it over?
9   A        Yes, sir.
10  Q        Okay.  Do you recognize it or recall
11  receiving it?
12  A        I -- I don't recall.  You know, I was
13  off their e-mail system at that point in time I'm
14  pretty sure.  But, again, this would be something that
15  Mr. Wilhoite would have talked to me about I'm
16  certain.
17  Q        Do you recall --
18  A        And he -- and he may have forwarded it
19  to me as well.  I can go back and even look to see.
20  Q        Well, do you recall generally in the
21  March or April 2013 time frame being aware that URS
22  was expecting Trinetics to pay $215,000 to URS?
23  A        I know that at some point, but I can't
24  tell you the date that Mr. Wilhoite had told me that
25  they expected some amount.  And I, you know, don't

Page 94

1   recall the exact amount to be paid.
2   Q        Okay.  In the last paragraph, Mr. Becker
3   says in the second sentence, "Please provide a
4   settlement proposal for the funds that URS is owed"
5   and then it goes on.  Do you see that?
6   A        Correct.
7   Q        Do you know if Trinetics ever did
8   provide a settlement proposal for those funds?
9   A        I don't believe so.
10  Q        Okay.  Why is that?  Do you know?
11  A        Because we didn't believe that we owed
12  those funds.
13  Q        Okay.  Were you aware at the time of
14  March or April 2013 that there had been an equitable
15  adjustment from URS to the government?
16  A        I don't believe I was aware of that.  I
17  -- I -- but I thought that the date was August of 2012
18  when the equitable adjustment was taken.
19  Q        That's what I was asking you:  Were you
20  aware in March '13 that that had happened?
21  A        I don't know if I was or not.  I do know
22  that there were -- there were occasions when John told
23  me that -- that URS said that they had to make an
24  equitable adjustment to the government, but I don't
25  know the timing on it.

Page 95

1   Q        Okay.  As you understood it, what was
2   Trinetics' reason for refusal to reimburse URS for the
3   amount of the equitable adjustment URS had paid to the
4   government?
5            MR. HEARD:  Object to the form.
6   A        We disputed the -- the amount of the --
7   of that.  And, you know, internally some of the things
8   we felt was that only in August of 2012, long after,
9   you know, we had started performance on this and all
10  the way to then had we ever heard that there was issue
11  that was going to require an equitable adjust.  Now,
12  I'm not saying that Mr. Ori might not know that or
13  someone else.  But I certainly wasn't aware of the
14  fact that there were performance issues that required
15  an equitable adjustment.
16           And, again, I feel -- I'm surprised that
17  we wouldn't have known about that at some point prior
18  to that because normally when there's an equitable
19  adjustment, there is correspondence between the prime
20  and the subcontractors and things like cure notices
21  and, I guess, show cause letters and so forth.  And I
22  don't believe there ever was one, except for that one
23  time which really I don't think flowed down from the
24  government per se but came from Mr. Becker to us
25  regarding the payroll issues in June of 2012.

Page 96

1   Q        Let me -- I want to go through what you
2   just explained to me slowly to make sure I understand.
3   In your capacity as representative of Trinetics, does
4   Trinetics dispute that any equitable adjustment should
5   have been given to the government, or does Trinetics
6   simply disagree with the amount of the equitable
7   adjustment?
8            MR. HEARD:  Object to the form.
9   A        I don't have any way of knowing at this
10  point in time whether there should be or should not be
11  or how much it would be or -- or anything.
12  Q        Okay.
13  A        It -- it seems to me that -- that that
14  all occurred after the -- the things that terminated
15  or that caused the August 2012 notice about equitable
16  adjustment all occurred after that June 15th.  But
17  there was nothing in that period of time when we were
18  performing -- or sometimes, you know, if you look at
19  two charts you showed me earlier, having some issues.
20  Nothing was said about any performance that would
21  have led to a subsequent term -- equitable adjustment
22  from the government.
23           (Exhibit Number 19 was
24           marked for identification.)
25  Q        Okay.  Take a look, please, at Exhibit

Page 97

1  19.  Let me know when you've had a chance to do so.
2  A      Okay.  (Witness complies.)
3  Q      Have you had a chance to look through
4  it, sir?
5  A      Yes, sir.
6  **Q      Okay.  Do you recognize this document?**
7  A      Yeah.  It's a contract mod.  Correct.
8  **Q      Okay.  It's a contract modification**
9  **between the government and URS; is that right?**
10 A      That is correct.  Uh-huh.
11 **Q      And the contract modification says in**
12 **the next to last line on the first page that it is a**
13 **decrease in the task order by $310,614.11; is that**
14 **right?**
15 A      That's what it says.  Yes.
16 **Q      Do you know what that's for?**
17 A      Do I know -- excuse me.  Do I know what
18 it's for?
19 **Q      Yes.**
20         MR. HEARD:  Object to the form.
21 A      Well, it's for an equitable adjustment.
22 I'm not sure I understand the question.
23 **Q      Do you know if this relates to the work**
24 **that Trinetics was to have done under its contract**
25 **with URS?**

Page 98

1         MR. HEARD:  Object to the form.
2  A      I don't know, but that's probably
3  because I'm not real good at reading a contract mod
4  like this.  I don't know, you know, specifically that
5  it applies to the Trinetics work or not.  But it --
6  for example, I'm not real sure about what it means
7  divide equitable adjustment for positions that were
8  vacant and, therefore, services were not provided
9  according with the PWS as submitted by URS proposals
10 dated 30 August and 31 August, of '12.  I'm not sure
11 what that refers to in terms of proposals.
12 **Q      Okay.**
13 A      And that just may be my lack of
14 knowledge on contracts.  I mean, is there something on
15 here that I could -- could I look at it and
16 specifically say that, yes, that relates to the work
17 we performed or someone else's work or URS's work?  I
18 guess that's where my confusion arises from.
19 **Q      Well, let's try this.  Look at the top**
20 **right section, line 10A of Exhibit 19.  Do you see**
21 **that?**
22 A      I do.  Uh-huh.
23 **Q      And it reads "10A mod. of contract/order**
24 **number"?**
25 A      Okay.

Page 99

1  **Q      And then the number is what?**
2  A      Are you asking me to read the number?
3  **Q      Yes, sir.**
4  A      FA3002-06-D-0003-0506.  Is that the
5  order on the contract that we have?
6  **Q      Let's take a look at Exhibit 10.**
7  A      Okay.
8  **Q      And I'll ask you to confirm that.**
9  A      Right.  That's correct.  That is the
10 right order, so that's the one that pertains to URS.
11 **Q      So that pertains to URS?**
12 A      That's correct.  Uh-huh.
13 **Q      Okay.  And now let me ask you one other**
14 **thing.  Give me just one minute, please.**
15 A      Sure.  No problem.
16 **Q      Let me ask you to come back to Exhibit**
17 **17 that we looked at earlier.  And do you remember at**
18 **the back there were two tables?**
19 A      I do.  Uh-huh.
20 **Q      Look at the first of them.  And at the**
21 **bottom right of the table, tell me what that number**
22 **is, the dollar value.**
23 A      262 -- $262,022.88.
24 **Q      Okay.  And on the next page, what's the**
25 **dollar value?**

Page 100

1  A      $48,591.23.
2  **Q      Now, go back to the first page of this**
3  **exhibit, which is the letter.**
4  A      Uh-huh.
5  **Q      And right in that table, do you see**
6  **those same two numbers that you're just read to us?**
7  A      I do.
8  **Q      And do you know what those two numbers**
9  **add up to be total?**
10 A      Looks like 310,000 or so.
11 **Q      Okay.  I'll represent to you they add up**
12 **to exactly 310,614.11, the number that you see on the**
13 **modification --**
14 A      Okay.
15 **Q      -- Exhibit 19.  So do you agree, sir,**
16 **that that modification is for an equitable adjustment**
17 **that was made on account of services that were not**
18 **provided by Trinetics between April 2011 and June**
19 **2012?**
20         MR. HEARD:  Object to the form.
21 A      Yes.
22 **Q      Give me a minute.  Let me get this**
23 **straightened out.  No.  You're fine.  I just don't**
24 **want to get things messed up.**
25         **(Exhibit Number 20 was**

Page 101

1    marked for identification.)
2  Q        Mr. Houser, just to clean up our record:
3  Tell me what Exhibit 20 is, please.
4  A        It's a -- our response to URS the first
5  interrogatories and the first request for production
6  of documents.
7  Q        Okay.  And you -- you have signed that
8  exhibit; is that correct?
9  A        That is correct.
10 Q        Okay.  Thank you.  Look in that exhibit,
11 please, at page three.
12 A        Uh-huh.
13 Q        Number two.
14 A        All right.  (Witness complies.)
15 Q        Where the question was:  "Set out
16 specifically and with detail the basis for the
17 calculation of Trinetics' claim" --
18 A        Uh-huh.
19 Q        -- "in the amount of $477,076" --
20 A        Correct.
21 Q        -- "as alleged in paragraph 10 of the
22 Complaint."
23 A        Uh-huh.
24 Q        And you have set out below there four,
25 should I call them, unpaid invoices?

Page 102

1  A        Other -- no.  These four down here are
2  offsets to that.
3  Q        Right.  But the answer to number two?
4  A        Oh, to number two?  Yes.  That's
5  correct.
6  Q        And so is Trinetics saying that those
7  four invoices were not paid?
8  A        We have subsequently found out that one
9  of those was paid, and another one was partially paid.
10 Q        Okay.  So when you did say --
11 A        We just -- we just found that out --
12 Q        Okay.
13 A        -- by digging down through some bank
14 records.
15 Q        Okay.  I tell you:  Let's go ahead and
16 do this.
17          (Exhibit Number 21 was
18          marked for identification.)
19 A        Do you want this one back?
20 Q        Well, no.  Hang on to it.  You'll need
21 it.
22 A        All right.
23 Q        So what I've given you now is Exhibit
24 21; right?
25 A        Correct.

Page 103

1  Q        And that is copy of a check in the
2  amount of $108,482.92?
3  A        Correct.
4  Q        Payable to Trinetics International?
5  A        That is right.
6  Q        Which Trinetics International deposited?
7  A        Correct.
8  Q        Okay.  So if we go back now to the
9  interrogatory answers, Exhibit, what was it, 20?
10 A        20.  Uh-huh.
11 Q        And we look at number two, that first
12 item there.
13 A        Right.
14 Q        CM task invoice number 8 rev.
15 A        Yes.
16 Q        108,653.
17 A        Yes.
18 Q        We're in agreement that has been paid?
19 A        It's off a little bit, but not by a lot.
20 Q        Okay.
21 A        It's 482 on the check, 482.92; and in
22 here it's 108,653.
23 Q        Okay.
24 A        But that has been paid.  We did finally
25 locate that as a deposit when we dug through bank --

Page 104

1  our bank accounts.  We had been looking at the wrong
2  bank account.
3  Q        So we can deduct that one from answer
4  two; is that right?
5  A        I'm not sure I follow you about answer
6  two.  Oh, from -- yes.  From here.  Yes, sir.
7  Q        From the answers to interrogatories?
8  A        I was thinking from the question you
9  asked me.
10          MR. HEARD:  We stipulate we've got
11 108,482.92.
12          THE WITNESS:  Right.
13 Q        Okay.
14 A        Yes.  As I said, it wasn't exactly.
15 But --
16          MR. BIDGOOD:  And can we also stipulate
17 -- well, let me just go ahead and mark these.  That
18 might be easier.
19          (Exhibit Number 22 was
20          marked for identification.)
21 Q        Take a look at Exhibit 22, please, sir.
22 A        Uh-huh.
23 Q        Let me know when you've had a chance to
24 do so.
25 A        (Witness complies.)

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 27 of 31

Tom Houser                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 105

1    MR. HEARD:  Jim, if it helps you, we'll
2  stipulate that we received $120,258.14; which,
3  apparently, is a portion of --
4    THE WITNESS:  Of this second one -- the
5  third one there.
6    MR. HEARD:  FMPC invoice --
7    THE WITNESS:  This one.
8    MR. HEARD:  -- 35015.
9    MR. BIDGOOD:  Okay.  That does help.
10  Let me go ahead and mark these exhibits just so I have
11  a record of what we're talking about here.  But I want
12  to come back to that in a second.
13  A    We did locate that one though.  Again,
14  it was in the wrong bank account or -- our bank
15  account wasn't the one we had checked.
16    (Exhibit Number 23 was
17      marked for identification.)
18  Q    That will be 23.  Do you recognize
19  Exhibit 23, sir?
20  A    No, sir; I don't.
21  Q    **Okay.  It says at the top date of**
22  **invoice, and then below that it says, to URS and from**
23  **Trinetics International, Inc.**
24  A    Correct.
25  Q    **Do you see that?**

Page 106

1  A    Yes, I do.
2  Q    **So I couldn't tell if this -- do you**
3  **know if this was a URS document or a Trinetics**
4  **document?**
5  A    I believe it's a Trinetics document.
6  Q    **Okay.  And do you see there that's the**
7  **number 128,258 or 120 -- let me restate that.  Is the**
8  **number 120,258.14 that Mr. Heard just referred to?**
9  A    Correct.
10  Q    **Okay.  One more, and we'll wrap this up.**
11    **(Exhibit Number 24 was**
12      **marked for identification.)**
13  Q    **Take a look, please, at Exhibit 24 and**
14  **tell me if you can identify that.**
15  A    (Witness complies.)  That relates to the
16  -- to this invoice.
17  Q    **Okay.  That's --**
18  A    That is Exhibit 23.
19  Q    **That's the 120,258 Mr. Heard referred to**
20  **a minute ago?**
21  A    Yes.
22  Q    **Okay.  Now, what I'd like to do --**
23    MR. BIDGOOD:  And we can go off the
24  record if you'd like.
25    (Discussion off the record.)

Page 107

1    (Exhibit Number 25 was
2      marked for identification.)
3  Q    Let me ask you if you recognize Exhibit
4  25, sir?  And it's printed front and back.
5  A    No, sir; I don't.
6  Q    **Okay.**
7  A    I mean, I -- are you asking the question
8  in the context of what it is --
9  Q    **Yes.**
10  A    -- or do I recognize it from --
11  Q    **No.  In general, do you recognize what**
12  **it is?**
13  A    I've not -- never seen a document, I
14  don't believe, that looked like this.  But, I mean, I
15  can figure out what it's -- what it's used for.
16  Correct.
17  Q    **What do you understand it to be used**
18  **for?**
19  A    I believe it shows the personnel that
20  are filling those different labor categories -- job
21  title categories during some period of time.
22  Q    **Okay.  And how many total were there as**
23  **reflected on the second page of this exhibit?**
24  A    Well, at the bottom of the first page,
25  it says "Total Deployed Personnel: 11."  And on the

Page 108

1  back it says "Total Personnel On-Site: 10."  And I
2  guess that's because -- well, I don't know whether
3  it's ten because of this vacant technician position or
4  because this Mr. Broyles was in the U.S. due to an
5  injury.
6  Q    **Okay.**
7  A    But, nevertheless, it says total
8  personnel on-site is ten.
9  Q    **Let me ask you to look at the Exhibit 20**
10  **again, the interrogatory answers.**
11  A    Okay. (Witness complies.)
12  Q    Page four.
13  A    Okay.  All right.
14  Q    **At the top is item six.  Do you see**
15  **that?**
16  A    I do.
17  Q    **Read over that to yourself, and read**
18  **over your answer.**
19  A    (Witness complies.)
20  Q    Let me know when you've done so.
21  A    Well, I guess I'd have to go to -- back
22  to the requests for admission that are above.
23  Q    **Well, before we do that, I'm just not**
24  **clear what -- what do you mean it is a result-oriented**
25  **after termination justification?  What did you mean by**

Case 5:13-cv-00712-TMP   Document 23-12   Filed 05/06/14   Page 28 of 31

Tom Houser                                      Trinetics International, Inc. vs. URS Group, Inc.

Page 109

1  that?
2  A        Okay.  Let me see.
3        MR. HEARD:  Let me object to the form.
4  I mean, obviously, he didn't draft these documents.
5  Most of this document -- most of this information is
6  prepared by counsel in response to information and
7  documentation in that he was -- or that we were
8  provided.  So go ahead and answer to that -- subject
9  to my objection.
10  A        Right.  Well, my belief is that had
11  there been issues as far back as they were, and I
12  think it was like in March of '11 or April of '11;
13  there would have been some type of notice issued
14  rather than -- and we did have one, of course,
15  obviously, payrolls in June.  But we didn't have any
16  related that I'm aware of to the understaffing on the
17  contract at any point in time; no -- no show cause, no
18  cure notices, nothing like that.  And the first time
19  that we thought that there was an issue -- financial
20  issue connected to that was in August of 2012.  So
21  that's what relates to that statement in that answer.
22  Q        To your knowledge, when was the first
23  time the government made a demand on URS for an
24  equitable adjustment or an account of understaffing
25  issues going back to 2011?

Page 110

1        MR. HEARD:  Object to the form.
2  A        To my knowledge, the first time is
3  August of 2012.
4  Q        Okay.  Would you have expected URS to
5  demand an equitable adjustment from Trinetics for
6  understaffing if the government had not made a demand
7  on URS?
8        MR. HEARD:  Object to the form.
9  A        I believe that they would have made a
10  demand for an equitable adjustment on us if they
11  received one for it.
12  Q        From the government?
13  A        From the government.
14  Q        Okay.  My -- my question wasn't clear.
15  If they didn't receive a demand from the government;
16  would you expect them, URS, to make a demand on
17  Trinetics for an equitable adjustment?
18        MR. HEARD:  Same objection.
19  A        I don't believe they would have made an
20  adjustment.  I don't believe they would have asked for
21  an equitable adjustment from us if they had not
22  received one.
23  Q        Okay.  If the first time URS was aware
24  that the government was demanding an equitable
25  adjustment was in August of 2012 --

Page 111

1  A        Uh-huh.
2  Q        -- wouldn't that explain why there had
3  never been a demand prior to that by URS on Trinetics
4  for an equitable adjustment?
5        MR. HEARD:  Same objection.
6  A        State the question again.
7  Q        Sure.  If -- if there had never been a
8  demand by the government --
9  A        Uh-huh.
10  Q        -- on URS prior to August 2012 for an
11  equitable adjustment --
12  A        Right.
13  Q        -- wouldn't that explain why there never
14  was a demand by URS on Trinetics prior to August 2012
15  for an equitable adjustment?
16        MR. HEARD:  Same objection.
17  A        They -- yes.  They wouldn't have asked
18  for it unless they received one.
19  Q        Right.
20  A        That -- that is correct.  They didn't
21  receive -- they did not receive it until August of
22  2010 after our subcontract had been terminated.
23  Q        August of 2012?
24  A        I'm sorry.  2012.  Correct.
25  Q        Right.  Right.  What was the condition

Page 112

1  of Trinetics in August 2012?  Could Trinetics have
2  paid the government $310,000?
3  A        No, they could not.
4  Q        You're aware of change -- I'm changing
5  the subject on you.  I don't want to confuse you.
6  A        Okay.
7  Q        You're aware that URS has asserted a
8  counterclaim in this action against Trinetics?
9  A        Yes.
10  Q        You're aware that URS denies that it
11  owes any money to Trinetics?
12  A        Yes.
13  Q        And you're aware that URS claims that
14  Trinetics owes money to URS?
15  A        Yes.
16  Q        And the amount of URS's claim, are you
17  aware, is in excess of $100,000?
18  A        I don't know the amount of the claim.
19  Q        Okay.  Assume with me that it's in
20  excess of $100,000.
21  A        Okay.
22  Q        If, in the trial of this matter, the
23  result of the trial is that URS is entitled to a
24  judgment against Trinetics in the amount of in excess
25  of $100,000 --

Page 113

1   A      Uh-huh.
2   Q         -- can Trinetics satisfy that judgment?
3          MR. HEARD: I'm going to object to the
4   form. That -- really you're getting now to post
5   judgment discovery and post judgment interrogatories.
6   If you want to talk about that outside depositions and
7   not on the record, we'll talk about that. But we're
8   not going to talk about that on the record. You don't
9   have a judgment. You can't engage in post judgment
10  discovery without a judgment.
11         MR. BIDGOOD: Well, let's go off the
12  record.
13         (Discussion off the record.)
14  Q      And, Mr. Houser, I'm going to ask you to
15  get Exhibit 1.
16  A      Do you want me to give you these back?
17  Q      Yeah. Thank you. You want to share
18  this with Mr. Heard because I didn't bring enough of
19  them.
20  A      Okay.
21  Q      Mr. Houser, let me give you context for
22  the questions I'm about to ask you. We, URS, we
23  requested that Trinetics put up a witness that could
24  address certain topics. Those are the topics that are
25  on this list.

Page 114

1          MR. HEARD: Jim, let me grab mine. Be
2   real quick.
3          MR. BIDGOOD: Sure. Sure.
4          MR. HEARD: It's just in the next
5   office.
6          (Discussion off the record.)
7          MR. BIDGOOD: Sure. Okay. We're back
8   on the record.
9   Q      And so, Mr. Houser, what we asked was
10  for Trinetics, the plaintiff --
11  A      Uh-huh.
12  Q      -- Trinetics International, to give us a
13  witness who could address the enumerated topics on
14  Exhibit A?
15  A      Uh-huh.
16  Q      And what Trinetics International has
17  done, if I understand correctly, is to identify you
18  and/or Mr. Wilhoite as being a witness who is capable
19  of addressing these topics subject, of course, to any
20  objections Mr. Heard might have.
21  A      Uh-huh.
22  Q      Are you with me up to that point?
23  A      I am.
24  Q      Okay. So with that, what I want to do
25  is just run through this list right quick before you

Page 115

1   and I finish up.
2   A      Okay.
3   Q      If there are topics in here that ought
4   to be deferred to Mr. Wilhoite, I need to know that.
5   If there are topics that ought properly to be
6   addressed by you and not Mr. Wilhoite, those are the
7   ones I want to address with you before we end up.
8   A      Okay. What about the other individuals
9   that we mentioned?
10  Q      Well, only you and Mr. Wilhoite, to my
11  knowledge, have been identified --
12  A      We are.
13  Q      -- as corporate representatives?
14  A      Okay.
15  Q      Okay. So number one, would that be you
16  or Mr. Wilhoite?
17  A      Really, to be honest with you, it would
18  be probably Mr. -- Mr. Ori. But I would say close --
19  closer to that should probably be Mr. Wilhoite.
20  Q      Okay. Number two?
21  A      Mr. Wilhoite.
22  Q      Number three?
23  A      Mr. Wilhoite.
24  Q      Okay. Number four?
25  A      Mr. Wilhoite.

Page 116

1   Q      Number five?
2   A      Myself.
3   Q      And is there anything that you can add
4   to what you've already explained to us in this
5   deposition on number five?
6   A      I don't believe so.
7   Q      Okay.
8   A      We hit it a couple of times, so I think
9   I'm pretty straight on where I think we are.
10  Q      All right. Thank you. Number six?
11  A      Probably Mr. Wilhoite.
12  Q      Number seven?
13  A      Myself. Because we've discussed that.
14  Q      And is there anything you need to add to
15  what you've explained?
16  A      Hold on. Let me read it again.
17  Q      Sure.
18  A      No. I don't believe so.
19  Q      Okay. Number eight?
20  A      Myself.
21  Q      Is there anything you want to add to
22  what we've already talked about?
23  A      No, sir.
24  Q      Okay. Number nine?
25  A      I'd say -- let me look at that closer.

Tom Houser                                              Trinetics International, Inc. vs. URS Group, Inc.

Page 117

1 Probably myself.  And I don't know of anything I would
2 have to add to it at this point in time.
3 Q      Okay.  Thank you.  Number ten?
4 A      Mr. Wilhoite.
5 Q      Number 11?
6 A      Probably Mr. Wilhoite.
7 Q      Number 12?
8 A      Wilhoite.
9 Q      Number 13?
10 A      Probably Mr. Wilhoite since he was the
11 one who, as I had told you earlier, first talked to me
12 about -- about that.
13 Q      Okay.  Number 14?
14 A      I'd say Mr. Wilhoite.
15 Q      Number 15?
16 A      Myself, since we've just talked about
17 it.  I believe we have another -- I don't believe I
18 have anything else to add to that.
19 Q      All right.  Good.  Thank you.  Number
20 16?
21 A      Mr. Wilhoite.
22 Q      Number 17?
23 A      Mr. Wilhoite.
24 Q      Number 18?
25 A      Myself.  We've discussed that, and I'm

Page 118

1 familiar now with -- with that.
2 Q      Right.  Number 19?
3 A      We -- we've discussed that.  It would be
4 me, though we don't agree exactly with that amount.
5 So Mr. Wilhoite would probably be a follow-on up to
6 that.
7 Q      Okay.
8 A      But it's primarily myself.
9 Q      Number 20?
10 A      Probably Mr. Wilhoite.
11 Q      Number 21?
12 A      That would be him, Mr. Wilhoite, for
13 sure.
14 Q      22?
15 A      Since he's done all of that
16 administrative and -- and pulling those, it would be
17 Mr. Wilhoite.
18 Q      All right.  Number 23?
19 A      Same answer:  Mr. Wilhoite.
20 Q      Number 24?
21 A      He did produce those documents, so it
22 would be Mr. Wilhoite.
23 Q      Okay.  Number 25?
24 A      The same:  Mr. Wilhoite.
25 Q      26?

Page 119

1 A      He's been dealing with that, so I'd have
2 to say Mr. Wilhoite.
3 Q      27?
4 A      You've talked to me about that, and I
5 kind of see us as coequal on that.  But I'd say at
6 this point in time; you need to talk to Mr. Wilhoite
7 since he worked at my direction to, you know, try to
8 recover documents.  The preserve part?  Probably not,
9 but for the recovery.
10 Q      How about 28?
11 A      I'd say Mr. Wilhoite.
12 Q      Okay.
13        MR. BIDGOOD:  And, Kevin, if I
14 understand you correctly; you're instructing him not
15 to answer 29.
16        MR. HEARD:  Yeah.  For the reasons we
17 discussed, that's right.
18        MR. BIDGOOD:  Lets go off the record.
19 Thank you.
20        (Short recess.)
21 Q      Mr. Houser, I don't have any more
22 questions for you.  I appreciate your responses to --
23 to my questions.  But before we conclude, I do want to
24 give you an opportunity to supplement or change if you
25 feel a need to before we close the record out.

Page 120

1 A      I can't think of anything.  A lot of the
2 dates and things are difficult for me to recall in the
3 sequence of things happening just because of things
4 that were going on at the time both personally and in
5 the company.
6 Q      And in that regard, I wish you good
7 luck.
8 A      Thank you.
9 Q      We're closed out.
10        MR. BIDGOOD:  I guess you're going to
11 reserve?
12        MR. HEARD:  Yeah, I'll reserve.
13        (END OF DEPOSITION.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 121

SIGNATURE OF WITNESS

I, _____, do hereby
certify that on this _____ day of _____
2014, I have read the foregoing transcript and to the
best of my knowledge it constitutes a true and
accurate transcript of my testimony taken by oral
deposition on March 17, 2014.

_____
WITNESS

Subscribed and sworn to
before me this _____
day of _____,
2014.

_____
NOTARY PUBLIC

MG

Page 123

MG          E R R A T A  S H E E T

Page      Line      Correction   Reason.

Page 122

C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above
and foregoing deposition was taken down
by me in stenotype, and the questions and
answers thereto were reduced to computer
print under my supervision, and that the
foregoing represents a true and correct
transcript of the deposition given by
said witness upon said hearing.

I further certify that I am
neither of counsel nor of kin to the
parties to the action, nor am I in
anywise interested in the result of said
cause.

_____
Merit Gilley, Commissioner
ACCR NO. 67