Case 5:13-cv-00712-TMP   Document 23-20   Filed 05/06/14   Page 1 of 16

FILED
 2014 May-06 PM 06:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

John Wilhoite                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2     NORTHERN DISTRICT OF ALABAMA
3       NORTHEASTERN DIVISION
4
5  TRINETICS INTERNATIONAL,)
6  INC.,           )
7                  )
8     Plaintiff,   )
9                  )
10 VS.             )   CASE NO:
11 URS GROUP, INC.,    )5:13-CV-00712-TMP
12                 )DEPOSITION OF:
13    Defendant.   )JOHN WILHOITE
14
15        S T I P U L A T I O N S
16
17     IT IS STIPULATED AND AGREED, by and
18 between the parties through their respective counsel,
19 that the deposition of:
20        JOHN WILHOITE,
21 may be taken before Merit Gilley, Commissioner and
22 Notary Public, State at Large, at the Law Offices of
23 Heard Ary, LLC, 303 Williams Avenue, Park Plaza, Suite
24 921, Huntsville, Alabama 35801, on the 17th day of
25 March, 2014, commencing at approximately 4:10 p.m.

Page 2

1     IT IS FURTHER STIPULATED AND AGREED that
2  the signature to and reading of the deposition by the
3  witness is not waived, the deposition to have the same
4  force and effect as if full compliance had been had
5  with all laws and rules of Court relating to the
6  taking of depositions.
7
8     IT IS FURTHER STIPULATED AND AGREED that
9  it shall not be necessary for any objections to be
10 made by counsel to any questions, except as to form or
11 leading questions, and that counsel for the parties
12 may make objections and assign grounds at the time of
13 the trial, or at the time said deposition is offered
14 in evidence, or prior thereto.
15              ***

Page 3

1
2         A P P E A R A N C E S
3
4  FOR THE PLAINTIFF:
5      KEVIN D. HEARD
6      Attorney at Law
7      Heard Ary, LLC
8      303 Williams Avenue
9      Park Plaza
10     Suite 921
11     Huntsville, Alabama  35801
12
13
14 FOR THE DEFENDANT:
15     JAMES K. BIDGOOD
16     Attorney at Law
17     Smith, Currie & Hancock, LLP
18     2700 Marquis One Tower
19     245 Peachtree Center Ave, N.E.
20     Atlanta, Georgia  30303-3800
21
22
23 ALSO PRESENT:
24     Chad Becker
25

Page 4

2         EXAMINATION INDEX
3
4  John Wilhoite
5  BY MR. BIDGOOD . . . . . . . . . . . . . .  5

Page 5

1    I, Merit Gilley, a Court Reporter of
2  Birmingham, Alabama, and a Notary Public for the State
3  of Alabama at Large, acting as Commissioner, certify
4  that on this date, as provided by the Federal Rules of
5  Civil Procedure and the foregoing stipulation of
6  counsel, there came before me on the 17th day of
7  March, 2014, at the law offices of Heard Ary, LLC, 303
8  Williams Avenue, Park Plaza, Suite 921, Huntsville,
9  Alabama 35801, commencing at approximately 4:10 p.m.,
10 JOHN WILHOITE, witness in the above cause, for oral
11 examination, whereupon the following proceedings were
12 had:
13            JOHN WILHOITE,
14 being first duly sworn, was examined and testified as
15 follows:
16            EXAMINATION
17 BY MR. BIDGOOD:
18 Q     Mr. Wilhoite, my name is Jim Bidgood.
19 And I represent URS Group in this litigation that's
20 been brought by Trinetics. You've been with us today
21 during the deposition of Mr. Houser, so you've
22 observed the process. Do you have any questions about
23 how we'll proceed or anything like that?
24 A     No, I don't.
25 Q     All right. Just a couple of points. If

Page 6

1  you don't understand one of my questions, please do
2  tell me that so I can correct it. And if you give an
3  answer and later decide you want to supplement it or
4  amend it in some way, perhaps you misunderstood it or
5  whatever, let me know that; so we can get that
6  straightened out.
7  A     Understood.
8  Q     It's about 4 o'clock now. Figure we'll
9  go for another hour or so and then knock off.
10           MR. HEARD: Your preference. No chance
11 of getting done I don't guess.
12           MR. BIDGOOD: I don't think that's going
13 to happen today.
14           MR. HEARD: That's fine.
15 Q     Give us your full name, please, for the
16 record.
17 A     John Warren Wilhoite.
18 Q     Okay. And where do you reside, sir?
19 A     I live in Birmingham.
20 Q     And by whom are you employed?
21 A     I am doing consulting work, financial
22 consulting work now since leaving Trinetics.
23 Q     On your own, or do you --
24 A     On my own.
25 Q     -- work with a company?

Page 7

1  A     On my own, I'm self-employed.
2  Q     Okay. All right. I'd like to ask you,
3  as you saw I did with Mr. Houser, just to give me a
4  recap of your educational experience, your work
5  experience.
6  A     Sure. Okay. University of Tennessee,
7  BS in accounting in '73.
8  Q     Okay.
9  A     From there went to Pricewaterhouse in
10 Birmingham. I stayed there until '85; 12 years. '85
11 went to Intergraph Corporation in Huntsville.
12 Q     Spell that, please.
13 A     I-n-t-e-r-g-r-a-p-h.
14 Q     Okay. Go ahead.
15 A     Computer hardware, computer software,
16 public company. Went in there as the SEC reporting
17 manager. Became controller shortly after that, and
18 became CFO ultimately. So I was there until 2000.
19 From there I went to Integrated Defense Technologies,
20 also in Huntsville. Private company at the time,
21 venture-backed with a plan to do an initial public
22 offering. So they hired me to help out with that.
23 And so that's -- that's what we did. Sold the company
24 in 2003 after we took it public to DRS Technologies, I
25 believe, in Jersey I think. So left there. 2003 went

Page 8

1  to Telairity Semiconductor.
2  Q     Would you spell that?
3  A     Yes. T-e-l-a-i-r-i-t-y. It's in Palo
4  Alto, California. Stayed there two years. I was a
5  CFO. Came back to Birmingham in '05. Went to work
6  for Emageon Corporation, E-m-a-g-e-o-n; essentially,
7  medical software, that sort of thing, software design.
8  Went there as a controller; became CFO. Left there in
9  2008, yeah 2008, when that company was sold to another
10 larger company. 2009 I took off. Couple of IT houses
11 and those kinds of things, a little too much
12 traveling. Took pretty much all of 2009 off. Around
13 mid 2010, I came to Huntsville and went to work for S
14 Cubed, the company that Tom Houser mentioned this
15 morning.
16 Q     Uh-huh. All right.
17 A     And I went there as the director of
18 mergers and acquisitions. The plan was to have me
19 help package and report on that company so it could be
20 sold. I got probably six months into that. The owner
21 -- it was a private company. Owner decided not to
22 sell, so it -- they didn't really require my services
23 any longer after that. Went from there to another
24 Huntsville company, 11i Solutions. It's the number
25 11, small i. Networking design, networking equipment,

Page 9

1  that sort of thing.  I'm having to look at my notes
2  here because the dates get messed up with me.  I
3  stayed there until I went to Trinetics.  Went to
4  Trinetics in around February 1st, of 2012.
5  Q        Okay.  Go ahead.
6  A        Well, that's it.  Trinetics.  We
7  officially -- I got there February 1st.  Ran into the
8  issues that -- that we've discussed here.  And pretty
9  much officially closed Trinetics around the end of
10 June, first week of July, of 2012; meaning all the
11 administrative staff were sent home.  And that was
12 pretty much it as far as the operations of the company
13 were concerned once we were through with the URS
14 contract.
15 Q        Uh-huh.
16 A        I stayed around there for another six
17 months; not necessarily full time, you know, every day
18 every week basis, but to support our efforts to
19 collect from DHL, try to manage -- handle the URS
20 situation, get the books finally ultimately closed
21 out, get everything packed up and moved into storage
22 and to file the tax returns that were due at that
23 point in time.
24 Q        When did you stop doing work with
25 Trinetics?

Page 10

1  A        I say officially, I'm going to say, the
2  middle of 2013.  But for 2013 it -- it -- I think I
3  mentioned before after we officially closed up, it
4  wasn't necessarily an everyday sort of thing.  And I
5  wasn't an employee.  We didn't have any employees
6  after that date, so it was pretty much full time for
7  quite a while after June of 2012.  Getting into 2013,
8  it was less so.
9  Q        But were you working as a consultant --
10 A        Yes.
11 Q        -- not as an employee?
12 A        That's correct.
13 Q        What kinds of things were you doing that
14 demanded full time in the summer of 2012?
15 A        We had to finally close the books.  At
16 that point in time, actually, we were still working on
17 2011.  We had extended the tax returns.  So still a
18 good bit of accounting clean-up type work to do, lot
19 of information gathering, a lot of work done on the
20 tax returns that were due, that kind of thing.
21 Q        Was Trinetics operating on any contracts
22 or anything in the latter half of 2012?
23 A        No.
24 Q        Okay.
25 A        No.

Page 11

1  Q        How were they managing to pay you and
2  whoever other employees that were working at that
3  time?
4  A        Mr. Houser paid me as a consultant.
5  Q        Okay.  And in your work as a consultant
6  at Trinetics, that was as a consultant to Trinetics or
7  as a consultant to some other entity on loan to
8  Trinetics?
9  A        It was to Trinetics.
10 Q        Okay.  What involvement, if any, did you
11 have in the decision to bring a lawsuit against URS?
12 A        I will say little to no involvement in
13 the actual decision.
14 Q        Okay.  That was --
15 A        It was more a support role.
16 Q        And what kinds of things did you do in a
17 support role?
18 A        Well, I mean, the normal fundamental
19 type questions:  How much do we believe URS still owes
20 us and why?  Where's the documentation?  That -- that
21 kind of thing.
22 Q        Okay.  Do you agree that there were
23 periods of time in which Trinetics was understaffed on
24 its contracts to URS?
25          MR. HEARD:  Object to the form.

Page 12

1  A        Well, again, I arrived there February
2  1st, of 2012.
3  Q        Right.
4  A        My task was to get the books
5  straightened out, look at a few things in terms of
6  cash flow, you know, prior and future, and help
7  Mr. Houser with, again, packaging that company so that
8  we could perhaps sell some of his equity to private
9  investors here in town.
10 Q        Uh-huh.
11 A        PowerPoint presentations, discussions,
12 that sort of thing, projections.
13 Q        Okay.  Well, during that --
14 A        So --
15 Q        I'm sorry.  I didn't mean to interrupt
16 you.  Go ahead.
17 A        So I was very well occupied with that.
18 So in terms of the -- of course I have no knowledge of
19 what happened in 2011.  But after I got there in
20 February of 2012, it was pretty much purely
21 financially involved.  So in terms of knowledge of day
22 to day, week to week, operating-type things like the
23 contracts and how those were proceeding; I had very
24 very little involvement in that.
25 Q        Mr. Houser used the word "crisis,"

Page 13

1  "financial crisis" at one point in his deposition.
2  Was the company in financial crisis when you joined it
3  in February of '12?
4  A        Yes.  Yes.  But I -- but I would say yes
5  to that, but with some -- some bit of optimism that we
6  could pull out of that and, you know, bid these next
7  ten contracts here; meaning the U.S., outside the
8  U.S., whatever our chances of winning those.  And when
9  I first got there, some -- I would say some small bit
10 of optimism that we could pull out of that.  But it
11 was critical at the time because as soon as I walked
12 in it was apparent that we had a certain level of
13 accounts receivable and, you know, incoming cash,
14 incoming funds and were -- on the other side of the
15 balance sheet, the debt was pretty -- pretty
16 astounding.
17 Q        Because -- primarily because of the DHL
18 situation or because of something else?
19 A        The DHL situation was a factor.  But it
20 really -- I'd say it was a part of an overall larger
21 problem in that.
22 Q        Uh-huh.
23 A        And that problem was a joint venture
24 that we -- they had entered into back in 2011 in Iraq
25 with another company, 50/50-type ownership.  And I

Page 14

1  think in attempting to -- to get that joint venture
2  established; a lot more funding went in that
3  direction, granted with hindsight, than probably
4  should have.  So it really strained the company's cash
5  flow and filled up the credit lines.  They resorted to
6  factoring before I got there.  Some, I think, fairly
7  bad economic, you know, financial-type decisions.
8  Q        Uh-huh.  Uh-huh.
9  A        So I -- I would say, yes, it was
10 critical as soon as I walked in.  It was pretty
11 obvious to me that we had to, you know, really, really
12 work the forecast, the projection for the rest of the
13 year.  Really, you know, beat the streets for new
14 contracts, that kind of thing, and also restructure
15 the debt that was existing when I got there.
16 Q        Mr. Houser made mention, as do the
17 interrogatory responses, to the factoring that you
18 just mentioned.  Tell me a little bit more about that.
19 Was Trinetics selling its accounts receivable for 90
20 percent?  80 percent?  Is that what factoring is?
21 A        Yes.  That's what it is.  I -- I may not
22 recall the exact terms.  But, generally speaking,
23 Compass Bank; we would present them with an invoice
24 that was, you know, hot off the press and ready to be
25 sent either to a factor or to a customer.  Present

Page 15

1  that invoice to Compass.  They would advance us 90
2  percent of that invoice.
3  Q        And so they would be paid essentially 10
4  percent to -- to do that?
5  A        Well, part of that was a reserve.
6  Q        Uh-huh.
7  A        I think their ultimate fee, in the end
8  after they had collected from the customer, was more
9  like five percent.  So they would hold back another
10 five percent just to cover themselves.
11 Q        Okay.  Well, during this time when you
12 were with Trinetics; were you aware of any conscious
13 decision on Trinetics' part to refrain from hiring
14 people who were needed for their contracts because of
15 cash flow considerations?
16 A        No.  None -- none at all.
17 Q        Okay.
18 A        They would have hired people for -- for
19 contracts, I think, irrespective of those decisions.
20 And it would cost a little bit to get a person, you
21 know, actually hired and located overseas.  But once
22 that person was there, they were -- they were covered
23 by the contract.  So --
24 Q        You gave a good rundown with your
25 education experience.  Let me go back to that for a

Page 16

1  moment.  Are you certified?  Are you a CPA, for
2  example?
3  A        Yes, I am.
4  Q        Okay.
5  A        Not a practicing CPA, but a CPA.
6  Q        Okay.  And that means you're registered
7  in how many states?
8  A        Two.
9  Q        Okay.  And what are they?
10 A        Tennessee and Alabama.
11 Q        Are you certified in any specialties as
12 an accountant or a financial officer?
13 A        No.
14 Q        Do you have any graduate degrees?
15 A        No.  Do not.
16 Q        Or special training?
17 A        No.  I mean, other than you would get --
18 I mean, 12 years with Pricewaterhouse --
19 Q        Right.
20 A        -- was lots and lots and lots of
21 training.  I used to -- I guess for a few years anyway
22 after I left public accounting, I would keep my
23 certificate active.
24 Q        Uh-huh.
25 A        And at that time I was working in public

Page 17

1  companies. So most of that training would have been,
2  you know, go to New York for four days, seminar on how
3  to file this SEC form or that form.
4  Q       Okay. I asked you earlier what
5  involvement you had in the filing of the lawsuit, and
6  you've answered that question. Since the lawsuit has
7  been filed, have you had a support role or a
8  consultant role in support of the litigation?
9  A       Yes. A support role.
10 Q       Tell me what that is, please.
11 A       All documents, production, you know, get
12 -- get your document requests in. We'd sit down and
13 go through that list and determine who's got those
14 documents, where they might be.
15 Q       Okay. Let's talk a little more about
16 that. Do you recall generally that you all produced
17 to us about 558 pages of documents?
18 A       I'm not familiar with the number of
19 pages. But --
20 Q       Okay. Do you recall that the documents
21 you produced to us were numbered, page numbered?
22 A       No. My role was to locate, as best I
23 could, those documents and turn them over to Kevin's
24 firm.
25 Q       All right.

Page 18

1         MR. HEARD: We would have been the one
2  that Bates stamped them if that's your question.
3         MR. BIDGOOD: No. Yeah. I figured
4  that.
5  Q       Tell me about a little more detail,
6  Mr. Wilhoite, what you tried to do to gather documents
7  responsive to the requests for production.
8  A       Okay. There were, I want to say, July,
9  probably more like August of -- of 2012, we were under
10 quite a bit of pressure from our landlord out at
11 Intergraph to vacate because we were pretty far behind
12 on our rent payments to them. So one of the more
13 immediate tasks was to vacate those premises. And to
14 do that; something had to be done with both the paper
15 files, the paper documents which were pretty extensive
16 and with our infrastructure, for lack of a term --
17 Q       Uh-huh.
18 A       -- the laptop computers and servers,
19 those kind of things.
20 Q       And so what was done with them?
21 A       The paper documents were boxed in
22 storage boxes, labeled and taken to Mr. Houser's --
23 he's got a rented storage facility out in Madison.
24 Q       Were they inventoried or indexed?
25 A       No, they're not really indexed. We -- I

Page 19

1  try to make as sure as I could that each box was --
2  was labeled in detail though. I mean, we could have
3  sat and done an index for that, but we didn't --
4  didn't actually officially do that.
5  Q       Roughly how many boxes do you think you
6  moved to storage?
7  A       I would say roughly 25.
8  Q       Your best estimate how -- how much of
9  that -- what percentage of that related to the
10 contracts with URS?
11 A       Well, we were -- we were boxing up
12 Trinetics, Inc. records. That's not URS.
13 Q       Uh-huh.
14 A       Trinetics International records, which
15 would relate to -- to URS and then Triham, the joint
16 venture, records as well. So -- and we're talking
17 multiple years too. They had, in the past, not moved
18 a lot of stuff out to --
19 Q       Uh-huh.
20 A       -- out to archive. So I'd say a pretty
21 small percentage of that would have been directly
22 related to URS.
23 Q       Do you believe that the documents that
24 have been produced to us are all the documents that
25 Trinetics has that are relevant to the disputes with

Page 20

1  URS?
2         MR. HEARD: Object to the form. When
3  you say "documents," what all are you including?
4         MR. BIDGOOD: Talking just about paper
5  now.
6  A       Okay. I do believe that's all we have.
7  I know there was an area or two that I'm still looking
8  for honestly.
9  Q       Elaborate on that. What is that?
10 A       There was a request for some 2011 time
11 sheet data --
12 Q       Uh-huh.
13 A       -- related to the URS contracts, and
14 2012 as well, you know, the two years that those
15 contracts existed. I've been able to locate 2012, and
16 I -- I can't explain why right now because I just
17 don't know, but 2011 I have not yet been able to
18 locate.
19 Q       Do you think some boxes have been thrown
20 out or lost or what?
21 A       I'm certain that -- that none that we
22 moved out around July, August 2012 were lost. I mean,
23 we were very careful with that.
24 Q       Uh-huh.
25 A       It's a locked facility. You know, front

Page 21

1  gate, a couple of more locks to get through until we
2  get into our unit; so I don't believe that that
3  occurred. Now, you know, what may have happened to
4  those 2011 records; I'm just not sure.
5  Q       Okay. And did I understand correctly
6  that you are continuing your search for paper
7  documents?
8  A       Yes.
9  Q       Tell me about that. Where are you
10 searching?
11 A       In the storage facility. But I'll also
12 tell you I have -- I'm on about my fourth round of
13 doing that. What I'm looking for now is perhaps maybe
14 they were just mis -- misboxed, mislabeled, something
15 of that nature.
16 Q       Let's talk about computer data,
17 electronic data. I guess let's go back to the time
18 when Trinetics was operating. Roughly how many
19 computers did you have?
20 A       There were three, yeah, three servers
21 there in the office.
22 Q       And how many computers?
23 A       I'd say there were about ten people at
24 -- at -- I guess at peak, eight to ten people, who
25 were in -- you know, working in that office on an

Page 22

1  everyday -- or, actually, that was at home base.
2  Q       Uh-huh.
3  A       And each of those eight or ten people
4  would have had either a desk top computer or a laptop
5  or both. So it's probably 16, something like that.
6  Let me -- laptops and desk tops and the three servers
7  where everything was pretty much stored.
8  Q       Right. What did you all do to try to
9  preserve the electronic information when you moved it
10 out of the office?
11 A       Well, I'll tell you what I did is we,
12 again, sort of, under time pressure to vacate the
13 premises, we decided that we had to not only deal with
14 the paper documents, you know, with the boxed storage
15 but with the servers as well. My fear was that we
16 would get locked out the premises and not be able to
17 get back to -- back to the data.
18         So Tom Houser -- we were looking for a
19 place to store things basically. He reached an
20 agreement, informal agreement I'm sure, with Kord
21 Technologies to store two of the servers at Kord
22 because they had just moved into a new office, had
23 lots of excess space. And then I would be allowed to
24 come over and, with some help from their IT person,
25 access what I needed from those servers. Now, those

Page 23

1  were -- those two, they were both administrative
2  servers; meaning they supported the administrative
3  networks, primarily e-mail I believe.
4  Q       Okay.
5  A       The third server was the -- the
6  accounting server. And we allowed Sandy Gaines to
7  take that to her home only because we were still
8  filing lots and lots of tax returns, you know,
9  finishing off the books first and foremost then filing
10 tax returns. And I had a need to request
11 accounting -- pure accounting data from her from time
12 to time. She would do that from her home.
13 Q       Okay. So take it from then to now.
14 What happened to the electronic information?
15 A       I don't know for sure. I -- the way it
16 went with Kord Technologies, I made one visit there to
17 retrieve some things off the administrative server.
18 And I'm probably a little more than technically
19 challenged when it comes to that sort of thing. So I
20 had their -- the Kord's -- Kord's IT person help me do
21 that. And he -- I don't know exactly how he did it.
22 But I brought my laptop to his office. And he
23 provided me with a link to -- not e-mail in its
24 entirety, but to Ed Ori's e-mail. That was in
25 response to some document production requests that we

Page 24

1  had gotten unrelated to URS.
2  Q       So you downloaded Ed Ori's e-mail to
3  your laptop?
4  A       Yes.
5  Q       Okay.
6  A       Now, since then, that link has expired
7  or become not functional in some fashion. I'm not
8  sure from an IT standpoint if that could be restored
9  or not. So that was quite a while ago. That was
10 okay. We -- we go along, and we start having needs
11 for other documents. So I began to ask Kord for some
12 more assistance in that respect. And they -- they
13 didn't answer me for a period of about two months for
14 reasons that I couldn't understand. Finally prevailed
15 on Tom; who is pretty close friends, I think, with the
16 Kord Technologies CEO; to prevail on their CEO to try
17 to get me an answer because we're late -- getting
18 behind on some of these document requests and tax rush
19 information and that sort of thing.
20         So they finally did answer, and their
21 answer was: Those servers -- the data that you had on
22 the servers has become corrupted. And I said, what do
23 you mean corrupted? You know, I don't understand
24 that. So he said, well, in part corrupted. But we've
25 also been using your servers for Kord business; which

Page 25

1  was not part of the arrangement, at least to my
2  knowledge it was not part of the arrangement.  So I'm
3  speculating, but I think it -- they either became
4  corrupted or they got written over with Kord business
5  or maybe -- maybe both.  And I do not know if that can
6  be restored or not.  I haven't -- haven't gotten an
7  answer on that.
8  Q       What happened to Ed Ori's e-mails?
9  A       It was loaded into my laptop.  But
10 through a link that this IT person provided me.  And
11 when I try that link now it doesn't work; perhaps
12 because the servers, which is where that was stored,
13 have been written over or have been corrupted.
14 Q       Do you know if Ed Ori's e-mails were
15 included in the documents that Trinetics produced to
16 URS?
17 A       I don't believe his e-mail was
18 specifically asked for.  You know, there were other
19 items there that my -- my intent was to -- you know,
20 when we get a request that says any document
21 pertaining to this, this or this to go back through,
22 among other things, go back through the e-mail of
23 people that might have been involved in those
24 conversations and see what was there.
25 Q       Uh-huh.

Page 26

1  A       But in Ed's case, I wasn't able to do
2  that because of this corruption issue.
3  Q       Okay.  Let me just be sure I'm clear on
4  this.  You're saying that you think none of Ed Ori's
5  e-mails were produced to URS by Trinetics?
6  A       I -- I don't -- I don't know that for a
7  fact.
8  Q       Okay.
9  A       I don't believe you guys asked for all
10 of Ed Ori's e-mail.
11 Q       Was there any -- let me come at it from
12 a different way.  Was any electronic information
13 produced to URS by Trinetics to your knowledge?
14         MR. HEARD:  Object to the form.
15 A       Any electronic information?
16 Q       Uh-huh.
17         MR. HEARD:  Can you define what you mean
18 by "electronic"?
19 Q       Yeah.  Did you download any files from
20 any computer anywhere and then include those in the
21 production to URS?
22 A       Yes.
23 Q       What were those?
24 A       Now, a lot of that I already had in my
25 laptop.  But those would have been in my -- my area of

Page 27

1  responsibility.  I mean, they would have all been from
2  the accounting files or from the accounting server.
3  Q       And what documents --
4  A       -- or my own personal --
5  Q       What kinds of kind of documents were
6  those?
7  A       Excuse me.  Or my own personal laptop.
8  Q       Okay.
9  A       You know, Excel schedules and things of
10 that nature.
11 Q       Okay.  What about your e-mails?  Were
12 they produced?
13 A       No.
14 Q       And what was the reason --
15 A       Well, let me back up.  Let me ask you
16 what -- produced in what way?  Produced to you or --
17 Q       Yes.
18 A       I don't -- I don't recall if -- if I --
19 I mean, I still have my e-mail, okay, on my laptop.
20 So I don't recall if I had to go back into any of that
21 and provide anything over to Kevin.  I don't -- I
22 don't remember.
23 Q       Okay.  Other than going back through
24 boxes, which you described for us earlier; are you
25 doing anything else to try to get documents to

Page 28

1  supplement Trinetics' production to URS?
2          MR. HEARD:  Object to the form.
3  A       Well, at this point it's -- it's going
4  back through boxes.
5  Q       Okay.
6  A       I mean, there -- there was specifically
7  on the -- on the time sheets, I know those existed in
8  -- in paper form.  They were hard copies and filed by
9  pay period.  And that's what I was able to locate for
10 2012 but, for whatever reason, not for 2011.
11 Q       But nothing with regard to try and
12 retrieve information from computers?
13 A       No.
14 Q       During your time when you were with
15 Trinetics, did you have any operations responsibility?
16         MR. HEARD:  Object to the form.  What do
17 you mean "operations"?
18 Q       Performance of contracts?  Management of
19 contracts?
20 A       No contractual -- contract -- customer
21 contract responsibilities at all.
22 Q       Were you an officer in the company?
23 A       You know, I -- I really don't know.  I
24 mean, I come to work there by offer letter that says
25 you're the chief financial officer.  But during my

Case 5:13-cv-00712-TMP   Document 23-20   Filed 05/06/14   Page 8 of 16

John Wilhoite                                          Trinetics International, Inc. vs. URS Group, Inc.

Page 29

1  tenure there, you know, as far as the corporate books
2  were concerned, the corporate legal looks, board
3  meetings, stockholder meetings, that sort of thing; I
4  was never, to my knowledge, placed into there as an
5  officer.
6  Q        Okay.
7  A        I don't know if being a CFO
8  automatically makes you an officer.  I never really
9  quite understood that question.
10 Q        Let me ask that question in a slightly
11 different way.  To whom did you report as you carried
12 out your responsibilities at Trinetics?
13 A        I consider myself to report to -- to Tom
14 Houser.
15 Q        In his role as chairman of the board?
16 A        Yes.
17 Q        Okay.
18 A        He hired me himself specifically to come
19 in and take a look at things and -- and try and help
20 package the company for some further equity sales.
21 Q        Okay.  Well, were you there as the
22 financial officer for the company; or were you there
23 to consult with Mr. Houser about his future plans for
24 the company?
25 A        I would say both.

Page 30

1  Q        Okay.  When you got there in February of
2  2012, who was the president of Trinetics
3  International?
4  A        I really don't recall at that time.
5  Q        When's the first time that you do recall
6  who the president was?
7  A        I think a -- I believe a couple of
8  months -- a few months after that, after my arrival;
9  we, the company, appointed Itelo White as president of
10 Trinetics International.
11 Q        Can you spell Itelo.
12 A        Yes.  I-t-e-l-o.
13 Q        Okay.  I don't believe I've heard that
14 name before.  Where -- where did Itelo White come
15 from?
16 A        Not sure where he comes from.  He -- I
17 may have seen him for one or two days in our
18 Huntsville office; and that's because he was working
19 the international, which for us at the time really
20 just meant the Middle East.  He was working that part
21 of the operation.  Primarily a business development
22 type.
23 Q        How long was Itelo White president of
24 Trinetics International?
25 A        Very short -- very short period of time.

Page 31

1  I would say about three months.
2  Q        Okay.  And then who was president after
3  he was no longer?
4  A        I don't recall what we did about that.
5  I don't know.
6  Q        What was Mr. Ori's role during the time
7  you were at the company?
8  A        He was the president of Trinetics, Inc.
9  Q        Okay.  And I'm sorry.  Help me remember
10 the relationship between Trinetics, Inc. and Trinetics
11 International.
12 A        Trinetics, Inc. was the -- was the
13 parent company.
14 Q        Okay.
15 A        It owned 100 percent of Trinetics
16 International.
17 Q        All right.
18 A        International confined to business
19 outside the U.S.  And Trinetics, Inc. focused on
20 domestic U.S. business.
21 Q        All right.  The financial crisis that
22 we've talked about before was a crisis for Trinetics,
23 Inc. or Trinetics International or both?
24 A        Both.
25 Q        Okay.

Page 32

1  A        Both.
2  Q        And both Trinetics, Inc. and Trinetics
3  International closed their doors and stopped doing
4  business?
5  A        Yes.
6  Q        Is that right?
7  A        Yes.
8  Q        The invoices that were owed I've heard
9  about from DHL were owed to which of those companies?
10 A        They were owed to International.  I
11 hesitate a little because there was a joint venture
12 arrangement there that complicated the DHL arrangement
13 a little bit.
14 Q        Uh-huh.
15 A        But --
16 Q        Okay.  Let me ask you to look at Exhibit
17 1.  Have you ever seen that document before, sir?
18 A        Yes, I have.
19 Q        Okay.  When did you see it?  Do you
20 remember?
21 A        I believe this one was given to me over
22 this past weekend.
23 Q        All right.
24 A        Maybe late last week.
25 Q        Do you understand that you've been

Case 5:13-cv-00712-TMP   Document 23-20   Filed 05/06/14   Page 9 of 16

John Wilhoite                                                        Trinetics International, Inc. vs. URS Group, Inc.

Page 33

1  designated as one of the witnesses who are testifying
2  on behalf of Trinetics?
3  A       I do. Yes.
4  Q       All right. And I went through the list
5  with Mr. Houser. Let me go through it with you. What
6  -- let me ask you to look at item number one. What do
7  you know about Trinetics' proposal, performance of the
8  work?
9          MR. HEARD: And let me object to the --
10 are you wanting him to tell you everything that he
11 knows at this point in time regarding the proposal for
12 the work, performance of the work giving rise to the
13 claims in litigation?
14         MR. BIDGOOD: I want know if he knows
15 anything about the proposal.
16         MR. HEARD: Okay. All right. I was
17 just trying to understand the scope.
18 A       That proposal happened, of course,
19 before I came to work with Trinetics.
20 Q       All right.
21 A       So I believe that I've seen it, but I
22 haven't sent -- spent any substantial time with it.
23 Q       Okay.
24 A       Performance of the work? I think I
25 answered that earlier. That was more on the

Page 34

1  operations side of the business, and I was fully
2  occupied on the financial end.
3  Q       Do I understand correctly that you don't
4  know whether Trinetics satisfied its contract
5  obligations to URS or not?
6          MR. HEARD: Object to the form.
7  A       Well, this is -- I guess a little
8  hindsight. When I began to get into this whole
9  situation --
10 Q       Sure.
11 A       -- it appeared to me that -- that
12 Trinetics had fulfilled their obligation to URS.
13 Q       Okay. Do you know, from your study of
14 the documents, what Trinetics' obligations were in
15 terms of the number of personnel they were to provide
16 to URS?
17 A       I know there's a schedule that exists.
18 I think we all had a look at it this morning, in fact.
19 But I believe that individual schedule actually is an
20 excerpt or -- or a creation of URS from the contract
21 itself. I know that it -- it shows a number of people
22 to be present at various months, I guess it was, you
23 know, work periods --
24 Q       Uh-huh.
25 A       -- during the contract.

Page 35

1  Q       Uh-huh. And -- and do you know whether
2  or not Trinetics actually provided the number of
3  people that were required by the contract?
4  A       Based on my look back at it and my
5  discussions with -- with some of the Trinetics people,
6  it appears there were times when we technically were a
7  person or two short for that given time period. There
8  were -- there were other time periods when there was
9  no shortage involved.
10 Q       Okay. Have you made any attempt to
11 calculate the times or the number of people by which
12 Trinetics was short?
13 A       I haven't made, you know, personally a
14 calculation of that or -- or an official Trinetics
15 calculation of that. I have looked at the support
16 that was given me by your -- by URS for their claimed
17 equitable adjustment in which they -- going by memory
18 now, they note the shortages for certain time periods,
19 apply salary rate to that and then some factors added
20 on top of it. So that's as close as I've come to any
21 -- any calculation.
22 Q       When did you look at that? Well, hold
23 on just a second. Let's make sure we're talking about
24 the same thing. I'm handing you now Exhibit 17. Is
25 that the document -- in the last part of that exhibit,

Page 36

1  there are two pages with a table on them? Do you see
2  those?
3  A       Yes.
4  Q       Is that what you're referring to?
5  A       Yes. This is the schedule I'm referring
6  to.
7  Q       Okay.
8  A       And what I did is to -- well, I mean,
9  read it top to bottom; but then try to come up with
10 the dollar figures that were at the bottom for each --
11 each month.
12 Q       In order to verify those numbers?
13 A       Yes.
14 Q       And what conclusion did you reach?
15 A       Well, first -- first, I was trying to
16 understand the numbers.
17 Q       Right.
18 A       Right. Not so much a -- a verification.
19 Q       Uh-huh.
20 A       But my conclusion was UR -- URS had gone
21 back month by month, as they should have; taken note
22 of the, I believe, temporary shortages that occurred
23 during those individual months and priced those out.
24 Q       Okay.
25 A       What's the value? What was the value of

Page 37

1  -- of those couple, three vacant positions during that
2  time period?
3  Q       Uh-huh.
4  A       And it appeared to me, by applying a
5  salary rate to it but then applying some add-ons as
6  well for, I suppose, fringes and GNA and overhead and
7  that sort of thing.
8  Q       Using that methodology, were you able to
9  replicate or verify the numbers that are shown on the
10 tables that are in Exhibit 17?
11 A       I was able to come to an understanding
12 of how they were formulated.
13 Q       Did you reach any conclusion about
14 whether the formulation was accurate or not?
15 A       My conclusion was, if I go back to the
16 contract, that I did not see anywhere in there where
17 one of the performance criteria was this number of
18 people for this given month.
19 Q       Okay.
20 A       That the performance criteria that I saw
21 were more in the nature of no more than two customer
22 complaints per month, no more than two late reports;
23 you know, those sorts of considerations that -- as
24 opposed to, you know, you're supposed to have this
25 many people in this month; and you cannot have

Page 38

1  anything short of that.
2  Q       You didn't see that in the contract?
3  A       I didn't personally. No.
4  Q       All right. Look with me in Exhibit 17
5  at the table that has the number in the bottom right.
6  $262,022.88. Do you see that one?
7  A       I do. Yes.
8  Q       And just for discussion purposes, look
9  at the top row, PO1 subcontract management. Do you
10 see that?
11 A       Yes, I do.
12 Q       And now look across that row to May of
13 2011. Do you see that?
14 A       Yes.
15 Q       Where it says eight of 11 personnel
16 on-site during this period?
17 A       Yes.
18 Q       Which would indicate, just at face
19 value, a shortage of three people?
20 A       Yes.
21 Q       Would you agree with that? Did you
22 undertake any effort to verify that there were, in
23 fact, eight of 11 personnel on site during that
24 period?
25 A       I didn't attempt to verify the eight. I

Page 39

1  did -- when all this came about, I did attempt to
2  inquire or understand why there would have been any
3  shortages.
4  Q       And what did you learn?
5  A       The explanation I was given by our
6  operations people were a couple of things: There are
7  people who are hired out of the United States and sent
8  there. And everything seems to be fine. But within a
9  matter of a few weeks, they decide it's not for them;
10 and they want to go back home, which would restart
11 another cycle of -- of resume searching and --
12 Q       Uh-huh.
13 A       -- trying to find the right person,
14 qualify that person so that they could get there and
15 replace whatever that vacancy was. And I know too
16 that there was at least one injury. I don't recall
17 the nature. There was at least one injury to an
18 employee at that point in time that would cause a
19 vacancy.
20 Q       Okay. Setting aside for a moment why
21 there was a vacancy, were you able to confirm that, in
22 fact, there were vacancies consistent with what's
23 shown on this table?
24 A       Yes. I've had -- again, our operations
25 people did not seem to dispute the fact that from time

Page 40

1  to time there were shortages.
2  Q       Okay. And now let me ask the next
3  question. Did you verify that the number of vacancies
4  as indicated on this sheet was an accurate number?
5  A       Not specifically for each month.
6  Q       Okay.
7  A       No. The conversation was more, here's a
8  month by month record. It looks like you were two
9  short here in this month, three short in this month.
10 Why?
11 Q       Uh-huh. Okay.
12 A       And that's about as far as I took it.
13 Q       One more question from the opposite side
14 of that coin: Do you have any reason to believe that
15 any of the data reflected on this table is not
16 accurate?
17 A       With respect to the vacancies; our
18 operations people, I don't believe, contest that. At
19 least they didn't in my inquiry of them. The rest of
20 the schedule, you know; to speak to that, I mean, in
21 the end you come down to dollar figures here by month.
22 And for me to speak to that, I think I would have to
23 confirm my understanding of how -- how URS made that
24 calculation month by month.
25 Q       Uh-huh.

Case 5:13-cv-00712-TMP   Document 23-20   Filed 05/06/14   Page 11 of 16

John Wilhoite                                                                 Trinetics International, Inc. vs. URS Group, Inc.

Page 41

1  A       And at that point, I think I would agree
2  or disagree with it based on what may be included in
3  those numbers for individual purposes.
4  Q       But as we sit here today, you don't have
5  any specific disagreement with anything that's set out
6  on either of these tables?  Is that correct?
7           MR. HEARD:  Object to the form.
8  A       Based on my, unconfirmed by URS,
9  understanding of how these were compiled; I do have an
10 issue, I believe, with the calculation.
11 Q       And what is the issue?
12 A       Again, it appears that the calculation
13 is based on salary for that vacant person plus an
14 overheard rate on top of that plus a fringe rate on
15 top of that plus GNA on top of that and even a profit
16 figure.  Now, that's what I believe.  I -- we haven't
17 been able to work through that with URS to have them
18 confirm or deny that.  If that's the case, I think I
19 do not disagree -- I do disagree with the calculation.
20 Q       Okay.  And what aspect of the
21 calculation do you disagree with?
22 A       I believe under FAR regulations that in
23 a situation like this, it may be -- and, again, I've
24 got to confirm this.  It may be that you would be
25 limited to a salary rate plus fringe benefits and not

Page 42

1  have the GNA, overhead and profit add-on.  That's --
2  that's my belief.
3  Q       Do you know whether Trinetics was paid
4  for these vacant positions?
5  A       That -- that's a little -- little more
6  involved.  There are two contracts in question.  My
7  understanding is that for one of those contracts it
8  was firm fixed price.  I believe they both were firm
9  fixed price but with a variation or two.  But for one
10 of those initially contract inception for some period
11 of time, we billed and were paid for whatever that
12 firm fixed price was per month.  Then, unconfirmed, I
13 believe it came about that there were some periodic
14 shortages.  So I believe that URS began to require us
15 to bill them only for the people that were provided
16 and -- and not the firm fixed price, which would have
17 covered the total allotment.
18 Q       Okay.
19 A       I believe that's the case.
20 Q       As you understand it, when did that
21 change occur?
22 A       I -- I do not know.
23 Q       Would it have been before you got there
24 or --
25 A       Oh, yes.

Page 43

1  Q       -- after you got there?
2  A       It would have been before.
3  Q       Okay.
4  A       On the other contract, which would be
5  the CM contract I believe; I believe that that one was
6  from the -- the outset a bill for people provided to
7  -- to the point where, you know, send me your time
8  sheets.  Send your time sheets to URS so that we know
9  how many and who we're paying for.
10 Q       Okay.
11 A       Which, best of my knowledge, would have
12 been adjusted for -- for any short periods of time.
13 Q       Okay.  Anything else about these sheets
14 that you disagree with?
15 A       I don't believe there is with respect to
16 the sheets.  I mean, I think, you know, the other --
17 the other question in my mind -- the question that we
18 have had is why these things weren't addressed and
19 resolved one way or the other, the shortages
20 specifically; why they weren't addressed and solved
21 long before the URS equitable adjustment occurred.
22 Q       How -- how would you envision that they
23 would have been addressed before the equitable
24 adjustment occurred?
25 A       Well, I would imagine that URS would

Page 44

1  say, last month you were three people short.  You owe
2  me -- and it caused me this much damage.  You owe me
3  this much money.
4  Q       Do you have an understanding of whether
5  Trinetics was billing URS for positions that Trinetics
6  had not filled?
7           MR. HEARD:  Object to the form.
8  A       Like I said, on one of the contracts; I
9  think early on in that contract, it was a fixed price
10 per month without regard to the number of people.  I
11 believe then that the issue began to develop, and URS
12 asked us for billing only for people actually
13 provided.  And the second contract, which I believe to
14 be CM, I think it was always people provided.
15 Q       Let's go back to Exhibit 1, and let me
16 ask you about item two.  Do I understand correctly
17 that the claims being asserted by Trinetics in this
18 litigation are for all of Trinetics' unpaid invoices
19 less a recognized offset amount?
20 A       That's correct.
21 Q       Okay.
22 A       At that time that we believed there were
23 four unpaid invoices.  And also aware of the fact that
24 URS had funded directly some of our payroll.  So I --
25 I guess it was a net figure resulting from those two

Case 5:13-cv-00712-TMP   Document 23-20   Filed 05/06/14   Page 12 of 16

John Wilhoite                                          Trinetics International, Inc. vs. URS Group, Inc.

Page 45

1  -- two factors.
2  Q        I want to move to item five on this
3  list.  What role did you play in the decision that
4  Trinetics would terminate its contract with URS?
5  A        My role was to, you know, make -- make
6  judgments and inform management of where we stood at
7  the time cashwise because cash, or lack of cash, was
8  our -- was our primary issue.  And in the course of
9  those, I would be able to say, here's how much cash
10 that we have.  Here are the bills that we have
11 incoming.  And more important to this issue, here is a
12 payroll that we've got to meet next week or the
13 following week.  And are we going to be able to do
14 that?
15 Q        When you were carrying out the
16 responsibilities you've just described, who -- who
17 were the management to whom you were referring?
18 A        Tom Houser, Ed Ori and Drew Kirksey.
19 Q        Okay.  Well, just so I'm clear:  You
20 didn't participate in making that decision.  You were
21 advising those three people on their decision making?
22 A        That's correct.  I was in the room as
23 they were debating that and coming to that conclusion,
24 but I didn't really offer any advice in that sense.
25 Q        Okay.  I'm going to hand you now URS's

Page 46

1  first requests for admission and other requests.  And
2  I'm going to ask you to look at request number 11.
3  Just read that yourself.  Share it with Mr. Heard if
4  you would.
5  A        Okay.
6  Q        And then I'm going to hand you now
7  Trinetics' response.  Do you see response number 11?
8  A        Yes.
9  Q        And response 11 was that Trinetics
10 admits that attachment seven was sent, but Trinetics
11 denies the allegations.  Is that a fair summary?
12 A        That's what it says.  Yes.
13 Q        Okay.
14 A        Uh-huh.
15 Q        And now I'm going to hand you Exhibit
16 16, which is that attachment seven to refresh your
17 recollection.  And what I want to ask you when you've
18 refreshed your recollection is why Trinetics denies
19 the allegations?
20          MR. HEARD:  Other than the legal basis?
21          MR. BIDGOOD:  Whatever he can testify to
22 as a witness.
23          MR. HEARD:  Object to the question.
24 A        I don't have any -- any knowledge of why
25 that would have been denied.

Page 47

1  Q        Okay.  Let me get those two back from
2  you, please, or three.
3  A        Uh-huh.
4  Q        Thank you.  Let me ask you to look at
5  number 14 in URS's requests for admission.  And let me
6  ask you just to that into the record so we'll have a
7  clean record.
8  A        Number 14?
9  Q        Yes, sir.
10 A        "Trinetics did not provide staffing as
11 required by its subcontracts with URS."
12 Q        And now I'm going to hand you Trinetics'
13 response and ask you to read response number 14.
14 A        Number 14 says "Denied."
15 Q        Okay.  And now I'm going to ask you --
16 and I think you've touched on this, but I want to be
17 sure to wrap it up.  What's the reason that Trinetics
18 denies that allegation?
19          MR. HEARD:  Object to the form.  Asked
20 and answered.
21 A        In looking at this, it was my belief
22 that Trinetics, under the contracts, had met their
23 performance criteria, the ones that I see stated in
24 the contract.
25 Q        Okay.

Page 48

1  A        I don't see it stated in the contract
2  that you must have eight people this month and ten
3  people next month.  So we did provide people.  I mean,
4  for me it's a question of whether we provided people
5  and met the performance criteria that are in the
6  contract; and they could be two separate things.
7  Q        Anything else?
8           MR. HEARD:  Other than a legal basis?
9           MR. BIDGOOD:  Whatever he can testify
10 to.
11 A        No.  That's it.
12 Q        Let me see that, please.
13 A        (Witness complies.)
14 Q        We've talked a little bit about this --
15 I'm changing the subject on you now, so there's no
16 confusion.  Tell me what you know of the equitable
17 adjustment that the government demanded from URS and
18 that URS made to the government.
19          MR. HEARD:  Object to the form.
20 A        What do I know of it?
21 Q        Uh-huh.
22 A        I learned this morning that that
23 spreadsheet that we had in front of us a few moments
24 ago sets out each month --
25 Q        Uh-huh.

Page 49

1  A       -- and the shortage and does the
2  calculation, that that's somehow related to the
3  adjustment URS received from the government. Until
4  that point, I hadn't really connected those two. And
5  to me, it was an adjustment being made by URS on
6  Trinetics.
7  Q       Elaborate on that. I'm not sure --
8  A       I was only vaguely aware at the time
9  that URS had perhaps received an equitable adjustment
10 from the government.
11 Q       Okay.
12 A       It wasn't clear to me how that came
13 about; whether URS asked for it or whether the
14 government just came down upon URS and demanded it.
15 Q       Okay. And is it clear now for you?
16 A       It's more clear now.
17 Q       Okay. Does that change your view about
18 **whether Trinetics is responsible to reimburse URS for**
19 **that equitable adjustment?**
20 A       No.
21         MR. HEARD: Object to the form.
22 Q       And why is that?
23 A       I look at the couple of contracts that
24 Trinetics had with URS. I look at performance
25 criteria. I search for any -- any valid complaint

Page 50

1  that URS had with Trinetics' work during the course of
2  the contracts up until the -- the end, as we all know.
3  And I asked whether Trinetics fulfilled its end of the
4  contract and, therefore, should be able to bill in a
5  way that we billed and collect on that. And I don't
6  see any reason as between URS and Trinetics that
7  Trinetics should not be paid for that work.
8  Q       Okay. Do you believe that URS gave
9  **money back to the government in the form of an**
10 **equitable adjustment?**
11        MR. HEARD: Object to the form.
12 A       Do I believe that?
13 Q       Uh-huh.
14 A       I -- I have no reason to -- to
15 disbelieve it.
16 Q       Okay.
17 A       But I -- I don't see the relevance of
18 that to Trinetics and URS.
19 Q       Do you have any understanding of how
20 **much of the work that was in URS's contract with the**
21 **government was subcontracted to Trinetics?**
22 A       No, I do not know that.
23 Q       Okay. Do you have any information to
24 **suggest to you that URS performed any of the work that**
25 **was in its contract with the government?**

Page 51

1         MR. HEARD: Object to the form. You
2  mean the -- I'm not sure I follow your question.
3  You're asking if he knows whether URS performed any of
4  the work with its contract with the government?
5         MR. BIDGOOD: Uh-huh.
6         MR. HEARD: Okay. Same objection.
7  A       I don't have any knowledge of any --
8  anything about URS's contract with the government.
9  Q       Okay. And you don't have -- or do you
10 **have any idea of the extent to which the equitable**
11 **adjustment that URS made to the government relates to**
12 **Trinetics' work under its contract with URS?**
13        MR. HEARD: Object to the form.
14 A       Well, again, at the time, meaning back
15 when all this first came up and we were going back and
16 forth on whether we should be paid or not and then,
17 ultimately, we get the letter that says we not only
18 don't owe you anything; you owe us because of the
19 equitable adjustment. To that point in time, I had --
20 I may have vaguely heard from Ed or someone that there
21 had been an equitable adjustment that occurred between
22 URS and the government. But it -- I didn't consider
23 it relevant to what we were trying to solve as between
24 Trinetics and URS.
25        In other words, to me it was simple.

Page 52

1  You know, here are the invoices. Here's what we
2  believe is unpaid and -- and due us. And then after a
3  few months pass, URS responds to that and says, we owe
4  you this invoice. We owe you that invoice. But here
5  are our offsets to that, and that's where the
6  equitable adjustment came in. And, again, it's only
7  today that I -- well, you -- you proved out the
8  numbers. I mean, here it is in Chad's correspondence
9  to me; and here it is again in the equitable
10 adjustment that URS had with the government. So 300
11 something odd thousand dollars.
12 Q       **So does that change your view? I'm not**
13 **following your point.**
14 A       No, it doesn't change my point. But my
15 view is as between Trinetics and URS.
16 Q       Let me ask you to look at Exhibit 9.
17 A       (Witness complies.)
18 Q       Exhibit 9 was an e-mail that was sent on
19 August 10, 2012, from Mr. Becker to Mr. -- to you;
20 right?
21 A       That's correct. Yes.
22        MR. BIDGOOD: Here, I have an extra copy
23 of it.
24        MR. HEARD: Thank you.
25 Q       And this e-mail advises Trinetics that

Case 5:13-cv-00712-TMP   Document 23-20   Filed 05/06/14   Page 14 of 16

John Wilhoite                                                Trinetics International, Inc. vs. URS Group, Inc.

```
                                                    Page 53
 1  there is going to be an equitable adjustment for
 2  services Trinetics didn't perform prior to the
 3  termination that the government is asking back.  Have
 4  I read that correctly?
 5  A      You have.
 6         MR. HEARD:  Object to the form.
 7  A      Yes.
 8  Q      Okay.  So this would have been just
 9  under two months after Trinetics defaulted on its
10  contracts?
11         MR. HEARD:  Object to the form.
12  A      That default was in June of 2012.  Yes.
13  Q      Right.  So this was just --
14  A      Uh-huh.  Yes.
15  Q      -- under two months after that.  And
16  then the letter I think you referred to was Exhibit
17  17.  Let me see this.  Is that correct?  Exhibit 17
18  was the letter that you were referring to a minute
19  ago?
20  A      Yes.
21  Q      Okay.
22  A      Yes, it is.
23  Q      So that letter, Exhibit 17, was not the
24  first that Trinetics heard about an equitable
25  adjustment; is that correct?
```

```
                                                    Page 54
 1  A      Well, no.  Given the e-mail here, you're
 2  -- you're correct?
 3  Q      Okay.  Did you know anything between
 4  August of 2012 and January of 2013, the dates of
 5  Exhibits 9 and 17, about this equitable adjustment?
 6  A      Did I know anything of it?
 7  Q      Right.
 8  A      No.
 9  Q      Did Trinetics make any effort to find
10  out anything about it?
11  A      I'm going to say no because we were
12  pretty well closed up by then.
13  Q      When you received the e-mail that we
14  marked as Exhibit 9 here, did anyone from Trinetics
15  object or protest to URS about an equitable adjustment
16  being paid to the government?
17  A      I don't believe so.  To the best of my
18  recollection, this would have been the only thing that
19  -- that we had to go by.  In other words, the nature
20  of the equitable adjustment, I don't believe, had been
21  ex -- explained to us at this point in time.
22  Q      To your knowledge, did anyone from
23  Trinetics ask about the equitable adjustment?
24  A      I did not.
25  Q      Okay.  Did anybody else?
```

```
                                                    Page 55
 1  A      I don't know.
 2  Q      Would you agree with me though that
 3  Exhibit 9 makes it pretty clear that URS is going to
 4  be looking to Trinetics for reimbursement for an
 5  equitable adjustment being made to the government on
 6  account of Trinetics' performance?
 7         MR. HEARD:  Object to the form.
 8  A      Yes.  But I mean, I receive an e-mail
 9  like this.  To me, that's URS informing me that they
10  can't yet answer my question on when we're going to be
11  paid because they're still calculating how much we
12  damaged them; okay?  I didn't -- didn't really focus
13  on the government as to URS's piece of this.  To me
14  this says, we're working on it.  We'll let you know if
15  we're going to pay your invoices or what part of your
16  invoices we're going to pay.  So without any further
17  detail I say, okay.  When you're ready to provide
18  details about what you're unwilling to pay, then
19  perhaps we can talk about it.
20  Q      Is Exhibit 17 the first notice, you're
21  saying, that Trinetics received of how much that
22  equitable adjustment was?
23  A      I don't believe I ever received notice
24  of how much the equitable adjustment was.
25  Q      Here in Exhibit 17, this letter?
```

```
                                                    Page 56
 1  A      I see that calculation.  But I don't
 2  know that that -- you know, I maybe misremembering
 3  this; but I don't know that that letter identifies it
 4  as the amount of the equitable adjustment URS received
 5  from the government.
 6  Q      Well, look at the table on the bottom of
 7  the first page.
 8  A      (Witness complies.)
 9  Q      Do you see the two line items there for
10  equitable adjustment?
11  A      I do.  Yes.
12  Q      Okay.  So was this the first notice
13  you're saying had of Trinetics had of how much the
14  equitable adjustment was?
15         MR. HEARD:  Object to the form.
16  A      I can't speak for Trinetics.  I mean, I
17  think there was a general awareness of Trinetics that
18  there was one.  I can't speak to whether anyone at
19  Trinetics knew an amount.
20  Q      Okay.
21         MR. HEARD:  Let me ask you a question:
22  Are you representing Exhibit 17 as one entire
23  document, Jim?  In other words that it was all -- when
24  this was sent, it was all sent just like it appears
25  here?
```

Case 5:13-cv-00712-TMP   Document 23-20   Filed 05/06/14   Page 15 of 16

John Wilhoite                                                                Trinetics International, Inc. vs. URS Group, Inc.

Page 57

1   MR. BIDGOOD: That's my understanding.
2   Yes.
3   MR. HEARD: Okay.
4   MR. BIDGOOD: Do you believe that's not
5   the case?
6   MR. HEARD: I don't know it to be the
7   case.
8   MR. BIDGOOD: Okay.
9   MR. HEARD: Do you know?
10  THE WITNESS: I don't recall.
11  MR. BIDGOOD: Well, we can dig into that
12  and find out. Why don't we go ahead and break for
13  tonight.
14  **Q      Before we break for the night, Chad**
15  **pointed out to me: If you'll look over on the**
16  **signature page that the attachments are listed there.**
17  A    Oh.
18  **Q      I had missed that.**
19  MR. BIDGOOD: Thank you. So, yeah,
20  that's my understanding, Kevin. It was sent that way.
21  MR. HEARD: Okay.
22  **Q      As we break, Mr. Wilhoite; I mentioned,**
23  **I think -- I think you were in the room. What I'd**
24  **like to do when we resume tomorrow is reconcile the**
25  **numbers that have been adjusted today so we understand**

Page 58

1   **exactly what Trinetics' claim is. Can we do that**
2   **tomorrow morning?**
3   A    Sure.
4   MR. HEARD: Do you want me to just
5   supplement the answers to interrogatories? that would
6   probably be the easiest thing.
7   MR. BIDGOOD: That's fine. I'd like to
8   start with that in the morning if that's possible.
9   MR. HEARD: Yeah. We'll just supplement
10  that, and you'll have it in writing; and we'll go from
11  there.
12  MR. BIDGOOD: Okay. That sounds good.
13  We'll break for the night. And what's a convenient
14  time to start?
15  MR. HEARD: 9:00 a.m.
16  MR. BIDGOOD: 9:00 would be fine. We
17  can be here at 8:30 if you want to do that.
18  (PROCEEDINGS END FOR DAY ONE.)

Page 59

SIGNATURE OF WITNESS

I, _____, do hereby certify that on this _____ day of _____ 2014, I have read the foregoing transcript and to the best of my knowledge it constitutes a true and accurate transcript of my testimony taken by oral deposition on March 17, 2014.

_____
WITNESS

Subscribed and sworn to before me this _____ day of _____, 2014.

_____
NOTARY PUBLIC

MG

Page 60

C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were reduced to computer print under my supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

_____
Merit Gilley, Commissioner
ACCR NO: 67

John Wilhoite                                                    Trinetics International, Inc. vs. URS Group, Inc.

Page 61

1  MG            E R R A T A  S H E E T
2
3  Page      Line      Correction    Reason
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

(404) 389-1155                                                   Page: 16